# EXHIBIT 2

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3

4

5   UNITED STATES          )    Cr. No. 04-10025-NG

6   VS.                    )    Courtroom No. 2

7   ANTHONY LAVELY         )    1 Courthouse Way

8                               Boston, MA   02210

9

10                     HEARING

11                FEBRUARY 8, 2005

12                  2:25 P.M.

13

14

15

16

17      BEFORE THE HONORABLE NANCY GERTNER

18        UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24            Valerie A. O'Hara

25          Official Court Reporter

1    A P P E A R A N C E S:

2        United States Attorney's Office, by TIMOTHY FEELEY,
     ASSISTANT UNITED STATES ATTORNEY, One Courthouse Way,
3    Suite 9200, Boston, Massachusetts  02210; for the
     United States;
4
         Eckert, Seamans, Cherin & Mellott, LLC, by STEPHEN R.
5    DELINSKY, ESQ. and ANDREW R. McCONVILLE, ESQ., One
     International Place, 18th Floor, Boston, Massachusetts
6    02110, for the Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.

2          MR. FEELEY:  Good afternoon.

3          THE COURT:  Good afternoon.  I'm a little bit

4    perplexed at the materials in the Lavely case, and here's

5    why.  The plea agreement allowed for a motion for a downward

6    departure.  No downward departure has been filed; is that

7    right, Mr. Feeley?

8          MR. FEELEY:  I've seen none.

9          THE COURT:  Mr. Delinsky, any downward departure

10   filed?

11         MR. DELINSKY:  Based on my understanding of the

12   case law, no downward departures have to be filed in light

13   of the Supreme Court cases.

14         THE COURT:  That's not true.

15         MR. DELINSKY:  That's how I understood the case

16   law to be in light of the guidelines are now advisory.

17         THE COURT:  Yes, but the advisory guidelines at

18   least require that you argue in terms of them to a degree.

19         MR. DELINSKY:  Yes.

20         THE COURT:  So if there were an encouraged

21   downward departure that would affect the case that I could

22   adopt, that would satisfy both the pre-Booker regime and

23   post-Booker regime, so clearly departure motions need to be

24   filed.  Secondly, you can't come in here and argue off the

25   page, which is essentially what I understand you wish to do.

1    In other words, the page here says that Mr. Lavely is

2    within, if I accept the enhancements, within 21 to 28

3    months, is it?

4         In other words, let me be more specific.  Whatever

5    else one does in this case, in any of these cases, I do look

6    at the guidelines, I look at the guideline calculations, and

7    I say to myself, does this case fit within the guideline

8    framework?  Does this case fit within the guideline?  Is

9    this a Defendant who is exactly what the guidelines had in

10   mind?  Is there something about this case that makes the

11   guideline framework inappropriate, and is that something a

12   standard that I can base my conclusion on, but you have to

13   grapple with the guideline framework, both as a practical

14   matter and I think as a legal matter.

15        Under the guideline framework here, Mr. Lavely is

16   in the range of 21 to 27 months.  You make an argument with

17   respect to a single enhancement.  You say that the

18   enhancement, that these were images of prepubescent children

19   raise Blakely issues.  That's an interesting question.  Even

20   if I don't have to put that before a jury, it seems to me

21   that if you're saying that there is an issue with respect to

22   that, that is something that then needs to be litigated,

23   needs to be established, and I would give you an opportunity

24   to litigate it.

25        After we have litigated it, if I accepted your

1  view that these were not images of prepubescent children, I

2  would then be in the range of 15 to 21 months.

3          MR. DELINSKY:  Correct.

4          THE COURT:  To say, to be out of that range, one

5  has to say there's a reason why to be out of the range.  In

6  other words, if you want to argue that Mr. Lavely is not in

7  that range, you have to give me a reason.  Clearly one

8  reason are the reasons listed in the guidelines, the

9  following diminished capacity.  Also, Booker makes possible

10  a host of other reasons why someone would be outside.  One

11  reason pre- or post-Booker is people who do child

12  pornography shouldn't get these kind of sentences because

13  that's a reason that requires me to substitute my judgment

14  for Congress and the Commission.

15          MR. DELINSKY:  I'm not saying that.

16          THE COURT:  So, that's off the table.

17          MR. DELINSKY:  I totally agree.

18          THE COURT:  So the question then is, what are the

19  reasons that would take off, reasons that would take us off

20  the guideline range that either fit within the category of

21  standard departure reasons or some other reasons, and

22  whichever, shouldn't Mr. Feeley have had notice of the

23  argument that you were making before today?

24          MR. DELINSKY:  Well, I think if I can address the

25  Court's comments in this order, it's my error.  I believe

1    after reading the case law that traditional motions for

2    downward departures no longer are applicable, and if I

3    misread the law, I misread the law, but that's what I

4    believe in reading the Fanfan and Booker cases.

5         I do believe that Mr. Feeley has been on notice

6    when I submitted to the probation a copy to him the

7    materials to be included which included the letter from

8    Dr. Schwartz where her recommendation was included in

9    Section F.

10         I have Dr. Schwartz here to testify, and to answer

11   the Court's other question about traditional departures

12   under the guidelines, I'm not arguing diminished capacity,

13   I'm not arguing unique family circumstances, I'm not arguing

14   some of the traditional accepted guideline departures.  I'm

15   not, but what I'm arguing is, which I think I'm allowed to

16   argue under the Supreme Court cases, is that the Court shall

17   impose a sentence sufficient but not greater than necessary

18   to comply with the purposes.

19         And I think that the sentence I'm going to ask the

20   Court to impose fits the definition of the statute to

21   reflect the one that reflects the seriousness of the offense

22   to afford adequate deterrence to the criminal conduct and to

23   protect the public from further crimes.

24         And based upon the materials and the presentence

25   report, the facts and knowledge about Mr. Lavely and his

1    evaluation by Dr. Schwartz and her testimony I would think,

2    and I would propose that those rationales, while not fitting

3    into a specific traditional downward departure, that was

4    recognized under the case law under the guidelines in

5    composite does meet the reasonableness test for the Court to

6    impose a sentence that is different than the guidance of the

7    guidelines.

8             THE COURT:   What if I said to you that every man

9    that I have sentenced on this offense or offenses like this

10   have substantial families, have substantial employment

11   histories and are generally extraordinary fine, upstanding

12   members of the community, and knowing that about this

13   consistency, the Commission and Congress set certain

14   penalties.   In what way is Mr. Lavely's situation different

15   from all of those, because if you can't answer that

16   question, then by sentencing to probation where the

17   guidelines call for two years, at the very least, I would

18   essentially be saying I disagree with Congress and the

19   Commission, and you see I think that that analysis is off

20   the plate.   It's off the plate here.

21             So, if you're arguing that from his background,

22   which sounds wonderful, and his family, which sounds

23   wonderful, what distinguishes this gentleman from all the

24   other people that are similarly situated, and if what you're

25   saying is Dr. Schwartz' report, I'll hear that, but

1    Mr. Feeley, are you prepared at all to address that?

2         MR. FEELEY:  I think I am.  I don't disagree what

3    Mr. Delinsky has said.  I have the materials that he has

4    submitted to probation.  I didn't get a traditional downward

5    departure motion.  I understood that it would be, at least

6    what I think I understood without being specifically told,

7    it would be a request for a variance under 3553

8    considerations, so to that degree, the Government is

9    prepared to go forward, but I defer to the Court if the

10   Court wishes more time or more information from

11   Mr. Delinsky.

12        THE COURT:  You see, this is a period of time of

13   some flux.

14        MR. DELINSKY:  Yes.

15        THE COURT:  And I'm trying to distill to try to

16   come up with standards, and I think all of us are between

17   the inappropriate standards pre-guidelines when a judge

18   could say I don't think someone accused of child pornography

19   should get this kind of time, I personally don't think so,

20   when a judge could say I don't believe in sentencing draft

21   dodgers to this amount of time or I don't believe in

22   sentencing marijuana users because I don't think marijuana

23   is so serious.  That's a disagreement about the fundamental

24   process of the regime versus saying I don't think that those

25   concerns apply in this case.

1    There's something special about this case, it's

2    not a departure analysis, there's something unique about

3    this case, there's something special about who the person

4    is, there's something special about the nature of his

5    psyche, because if there isn't something special, something

6    compeling, then I would be obliged to do this in every like

7    case.  If I'm obliged to depart in like cases, then I'm

8    essentially throwing the guidelines and the statute out the

9    window, so I'm trying to understand and calling for people

10    to give me more information about the individuals than

11    simply he's a nice person, he's a good man.  It's obviously

12    clear he's a good man, but the Congress and Commission have

13    swept again men into this category.

14         I don't think that judges who will allow that kind

15    of consideration to enter into the picture?  These sentences

16    will stand.  That may be shocking coming from me, but I

17    think this has to be a rule-based regime, and we have to

18    figure what the rules are.  If you want to proceed with

19    Dr. Schwartz, I'll give you some more time.

20         MR. DELINSKY:  I would like to proceed with

21    Dr. Schwartz, she is available, her time is precious, and if

22    after hearing Dr. Schwartz and some of the other things that

23    I was going to say, I certainly have no problem and then we

24    can continue the sentencing so that I can provide the Court

25    additional information.

1    You know, I'm struck though, Judge, to some degree

2    about your comments about the similarity of many offenders

3    who are charged with this and like offenses.

4    There are in any offense regime some similarities

5    that one tends to see, but the individuals, and one of the

6    problems with the guidelines is that they tended to blur

7    unique things about the individuals and made it very

8    difficult to fit certain conduct into certain accepted

9    departures because of the case law interpretation that made

10    it more and more difficult, extraordinary family

11    circumstances.  We could come up, for example, with a common

12    sense definition, but our First Circuit somewhat rejected

13    that.

14    THE COURT:  But you see, that is what I think is

15    open.

16    MR. DELINSKY:  So I agree, and to the degree, I

17    highlighted it in here, for example, Mr. Lavely is playing

18    an important role in the support and help of his son and

19    daughter-in-law, vis-a-vis, the care of his grandson who is

20    suffering from autism.  Mr. Lavely has a very significant

21    position at Mercury Computers where it's somewhat outlined

22    some of the critical work he is performing, not only in the

23    medical field but in the defense-related field in working

24    and supplying that type of information.

25    In addition, he's been under treatment from

1    New England Forensic Associates, and, in particular, therapy

2    with Dr. Schwartz, who is a Ph.D. in criminology and

3    psychology.  She's been treating sex offenders for 37 years.

4    She previously headed the sex offender treatment programs

5    for the states of New Mexico, Missouri, Washington and

6    Massachusetts where she headed the treatment center at

7    Bridgwater for ten years, so she's eminently qualified.

8            And when she states that in her professional

9    opinion that jail is counterindicated for this man, I think,

10   coupled with all of those reasons, that this case does

11   present an analysis, while not fitting into a particular

12   traditional departure, has elements of departure language or

13   departure case law, when put together, can articulate

14   reasons.

15           Now, it's my fault that not knowing the regime as

16   to how to proceed now, and I apologize because it is my

17   responsibility, I'm sort of wading through this, too, and

18   obviously some of the arguments that I am advancing, I would

19   not have made if the Supreme Court had made the decision it

20   made.

21           I remember going to a seminar when the guidelines

22   were first put into practice and Judge Breyer then of the

23   First Circuit was there, and he said the guidelines are not

24   straight jackets.

25           THE COURT:  Right.

1          MR. DELINSKY:  They're there for you to be

2    creative, there is going to be room.

3          THE COURT:  I think I was in the same seminar.

4          MR. DELINSKY:  And obviously as it's come down to

5    the end of 2004, that's now how it works.

6          THE COURT:  I want to give you more time.  I'm

7    actually in the middle of writing, I declared the guidelines

8    unconstitutional in July, between July and now I have

9    sentenced 13 people so I'm actually writing up 13 sentences

10   so people can get a rules what I saw them, and what my sense

11   is, on the one hand, there's the guidelines, the straight

12   jacket, which is what is disparaged in Booker.

13         On the other hand, there's all the indeterminant

14   sentencing.  We are not at indeterminant sentencing, nor are

15   we at mandatory sentencing, we are at what I like to call

16   what could be guidelines light, what could be a rule-based

17   regime, but it has to be a rule-based regime, it can't be

18   just this sentence fits within the purposes of 3553A.  You

19   have to tell me how.  You have to tell me why.  You have to

20   tell me why the case tomorrow will not be identical to this

21   case and why your argument doesn't mean that I will be going

22   off the page for everybody similarly situated.

23         I will appreciate those arguments.  I am looking

24   at those arguments very carefully, but it has to be an

25   articulated rule, not just, you know, that this is a man

1    with a stable family and wonderful job and good works and

2    doesn't deserve jail, because while I might personally agree

3    with you on that, as you probably know I do, I left my

4    personal feelings when I took the robe.

5            So, I left my personal feelings when I took the

6    robe to a degree.  I want to understand who this human being

7    is.  Why don't we do this, I'll hear from Dr. Schwartz.

8            MR. DELINSKY:  Thank you, Judge.

9            THE COURT:  Mr. Feeley, if you want some time to

10   cross-examine, I'll give you that time.

11           THE COURT:  Dr. Schwartz, you sit up here.

12           BARBARA SCHWARTZ, Ph.D., having been duly sworn

13   by the Clerk, testified as follows:

14                     DIRECT EXAMINATION

15   BY MR. DELINSKY:

16   Q.   Could you state your name and occupation.

17   A.   My name is Dr. Barbara Schwartz, S-c-h-w-a-r-t-z.  I am

18   a forensic psychologist.

19   Q.   Could you briefly describe your educational degrees to

20   the Court?

21   A.   Yes, I have a B.A. in psychology from the University of

22   New Mexico I received in 1966; I have a Master's Degree in

23   Psychology received from the New School for Social Research

24   in New York City, that was 1969; and I have a combined Ph.D.

25   in psychology and criminology from the University of

1    New Mexico, which I received in 1977.

2    Q.   And have you been involved in the course of your

3    professional duties in treating sex offenders?

4    A.   Indeed, I have.

5    Q.   Would you briefly describe to the court the various

6    official positions you have held for various states and

7    their sex offender programs, if any?

8    A.   Yes, beginning in 1970, I was employed at the Bernally

9    County Mental Health Mental Retardation Center, when the

10   judges came and asked us to research and establish a

11   treatment program for sex offenders, which I did, a program

12   called PASO, P-A-S-0, which became the second outpatient

13   clinic for sex offenders ever to be established in the

14   United States.

15          In 1980, I went full time with the Department of

16   Corrections in New Mexico and established their first sex

17   offender treatment for the Department of Corrections.   In

18   1988, I moved to the State of Washington where I established

19   their first state-wide sex offender program, which I headed

20   until 1992, when I was recruited by Justice Resource

21   Institute of Boston to come and be the clinical director of

22   the Massachusetts Treatment Center for Sexually Dangerous

23   Persons.

24          At the same time, in 1966, I established a company

25   called Public Safety Concepts, which I am still the

1    president of, which ran the sex offender treatment program

2    at the adult diagnostic and treatment center in Avonville,

3    New Jersey.

4    Q.   Would that have been in 1996?

5    A.   1996, correct.  Several years later we added the State

6    of Missouri and we continued to operate the sex offender

7    treatment program for the State of Missouri.  I also am a

8    research associate with Justice Resource Institute on a

9    major research on sexually dangerous persons.  I treat

10   juvenile sex offenders for the Department of Youth Services,

11   and I am an associate of New England Forensic Associates.

12   Q.   What is New England Forensic Associates, Dr. Schwartz?

13   A.   It is a group of forensic psychologists and other

14   therapists who specialize in the evaluation and treatment of

15   sexual offenders.

16   Q.   Do you have a copy in front of you of Dr. Ball's report

17   of December 21st, 2003 regarding Mr. Lavely?

18   A.   I do.

19            MR. DELINSKY:  I would ask, your Honor, that that

20   be marked Exhibit 1.  All the parties have a copy.

21            THE COURT:  Is there an objection, Mr. Feeley?

22            MR. FEELEY:  No, your Honor.

23            THE COURT:  It will be so marked.

24            THE CLERK:  I'll just mark it as Exhibit 1.

25            (Dr. Ball's report of December 21st, 2003 was

1  marked Defendant's Exhibit No. 1 in evidence.)

2  Q.  And are you familiar with this report, Doctor?

3  A.  I am.

4  Q.  Have you read it before?

5  A.  I have.

6  Q.  And did you discuss its consents with Dr. Ball?

7  A.  I did.

8  Q.  Dr. Ball is one of your associates who you work with at

9  New England Forensic Associates, correct?

10  A.  Correct.

11  Q.  One of the tests that was performed on Mr. Lavely was

12  the penile plethysmograph laboratory study, correct?

13  A.  Correct.

14  Q.  The report stated that Mr. Lavely did not respond to any

15  of the stimulus materials, thus no conclusions can be made

16  from this procedure.  This result occurs in approximately 15

17  to 20 percent of tests given and may be a result of a

18  client's discomfort in undergoing the somewhat intrusive

19  test procedure.  What significance, if any, do you make

20  regarding that conclusion of Dr. Ball?

21  A.  Well, we could certainly say that he didn't have deviant

22  arousal to the extent that it would have overcome and show

23  up on the plethysmograph.  Also, for an individual I'm not

24  sure whether the Court is familiar with what a penile

25  plethysmograph.

1              THE COURT:  I am.

2              THE WITNESS:  We won't go there.

3              THE COURT:  You don't go there, right.

4    A.   It's certainly an extremely anxiety-provoking and

5    intrusive procedure where I would say about 50 percent of

6    the patients I see don't respond to this and certainly

7    somewhat over 60 I would be very surprised if they did

8    respond on the penile plethysmograph.

9    Q.   The next test that was performed was the Abel Assessment

10   of Sexual Interest, correct?

11   A.   Correct.

12   Q.   Now, could you describe generally what components, if

13   any, that test has?

14   A.   It's basically -- it has two components.  One component

15   is simply a 300-question questionnaire.  The other is you

16   have the individual go into a room, sit down at a computer

17   and he's to rate 160 slides which are redundant on a 1 to 7

18   range as to how sexually attractive the individual finds

19   these different code models of both genders, various ages.

20            At the same time, actually what the test is, that

21   is what the individual taking the test believes that he is

22   doing.  Actually what it is really measuring is the visual

23   reaction time in microseconds of how long an individual is

24   looking at a particular model.  This has been found to be

25   correlated with sexual attraction that then produces a graph

1   which shows not only what the individual reported but what

2   the visual reaction time indicated as well.

3   Q.   And is it true that on that aspect of the test that

4   Mr. Lavely's responses on this assessment indicated that he

5   is a heterosexual man with strong interest in physically

6   mature females?  "There is no indication that interest in

7   children, either males or females.  It should be noted;

8   however, that this test does not distinguish between

9   interest in physically mature adolescents and adults because

10  from a biological view most adult males show some sexual

11  interest in physically mature older adolescents."

12              THE COURT:  Where are you reading from?

13              MR. DELINSKY:  From Exhibit 1.

14              THE COURT:  The December 22nd.  What page are you

15  on?

16              MR. DELINSKY:  I'm on page 3.

17  Q.   "The most reliable and valid measures of the Abel

18  Assessment are in the categories of sexual interest under

19  the age of 13, and in those categories, Mr. Lavely does not

20  have to be deviant interest."  Is that what the test result

21  showed?

22  A.   That's correct.

23  Q.   Is that what the test results showed?

24  A.   Yes.

25  Q.   Now, the other part of the test that dealt with

1    answering questions, what part of the test is that called?

2    Is there a specific name for that test?

3    A.  It's just the written questionnaire for the Abel.

4    Q.  Now, in the remainder of the report, Dr. Ball talked

5    about various parts of that test where Mr. Lavely answered

6    these 300 specific questions?

7              THE COURT:  One second.

8    Q.  One of the items that she discussed was his response

9    pattern on the social desirability scale; is that correct?

10   A.  That's correct.

11   Q.  What is the social desirability scale?

12   A.  It's a scale where people are denying common human

13   frailties, so you get a sense if they ever deny being angry,

14   it's a way to measure how candor they're being.

15   Q.  Okay.  And this test indicated that Mr. Lavely was

16   someone who was unwilling to admit to minor violation of

17   common social mores such as patient's feelings of anger

18   suggesting that he attempted to present himself in an

19   unrealistically favorable light; however, it is not uncommon

20   for persons undergoing evaluation such as this to respond in

21   a somewhat defensive manner.  In your course of treating

22   Mr. Lavely, have you dealt with this issue?

23   A.  Yes, we have, repeatedly.

24   Q.  Can you describe what you've learned about Mr. Lavely in

25   this regard?

A.  Well, if you conceptionalize sort of basic human

personality on a dimension of emotional responsiveness to

kind of rationality or emotions versus intelligence, there

are people certainly who are overly emotional.  They are

referred to as hysterionic personality, they get extremely

upset about things, they're likely to fly off the handle,

and then you have people who they deal with everything

according to whether it's rational.

Mr. Lavely, and we've often gone around this in

therapy, my confronting him about are you angry about this?

Well, he doesn't feel angry about things.  Aren't you

jealous about this?  No, he's the kind of person that would

say I'm not worried about the Court procedure because it

doesn't make sense to be worried about the Court procedure.

What would being worried about the Court procedure possibly

do to change things?

So, he is a super rational kind of individual, and

that is the kind of thing that would be picked up on that

because it says things like your thoughts, have you ever

thrown anything in anger?  True or false.  Have you ever

thought about killing yourself?  That kind of thing, or have

you ever, you know, been so distraught that you yelled at

your coworkers in anger?

So, he's not somebody who is demonstrative and he

is somebody who denies the role of emotion in everyday

1    circumstance.

2    Q.   Is that one of the areas where you're treating

3    Mr. Lavely?

4    A.   Yes.

5    Q.   Mr. Lavely's score on the scale of the social

6    desirability scale, does that cause any concern as was

7    interpreted by Dr. Ball on the Abel Assessment?

8    A.   Well, this is something he scores in the 33 percent

9    range, which is actually one point into the problematic

10   range.  The individuals in our treatment program are people

11   who have been accused or convicted or whatever of sexually

12   inappropriate behavior.  Almost every individual who

13   initially comes into us has some -- has either justified or

14   rationalized or minimized their conduct in some way.

15          When you find people who don't do that, I was

16   treating a patient the other day who just came in and

17   started describing all these sexual offenses that he had

18   committed.  He was completely at home with them, completely

19   comfortable with them, not at all -- they were what's

20   referred to in the psychological field as ego-syntonic.

21          If behavior on any of our parts is the opposite of

22   that being ego-dystonic, so if we do something in our own

23   life that we really know is not right, then we usually go

24   and find some way to excuse it, I went and spent more money

25   than I should have on this dress, but it's a special

1    occasion, and, therefore, that's a good excuse.

2          These represent excuses and justifications, but

3    that's just part of sex offender treatment that you treat

4    those, and we have addressed those in treatment.

5          THE COURT:  Where does his score in the 33 percent

6    range fit with respect to the other individuals you've

7    treated?

8          THE WITNESS:  If it's a -- well, 50 percent would

9    be the normal person taking the Abel, this would be below,

10   he would have less cognitive distortions but not necessarily

11   less ego-dystonia, so he would just be considered this isn't

12   going to be a big challenge, he's not totally involved in

13   believing outrageous kinds of things about inappropriate

14   sexuality.

15   Q.  Now,   --

16         THE COURT:  So, he's neither, when you're saying

17   it's not ego-dystonic, he's not excusing it, he's simply not

18   addressing it?

19         THE WITNESS:  He is responding to a few cognitive

20   distortions like, and this isn't one, but this would be an

21   example of one, taking pictures of naked children does not

22   bother him.  So, he might say I agree, so then part of the

23   therapy would be then we deal with that particular cognitive

24   distortion.

25   Q.  Now, the statistical analysis that's in the rest of

1    Dr. Ball's report on page 4 on the probability, what is the

2    status today of New England Forensic Associates relying on

3    the statistics that Dr. Ball quoted in 2003?  Has something

4    changed?

5    A.    Yes, and it's just not New England Forensic Associates,

6    it's actually all around the country.  Actually, this has

7    kind of come full circle, I was involved in my work in

8    misery in challenging Dr. Ball on the statistical validity

9    of the test in general because we were finding that at least

10   50 percent of the inmates that we were testing in Missouri

11   were simply scoring on the visual reaction time.  They would

12   just put 1 or they would push 7; so 1 would be you have

13   absolutely no sexual interest in this individual that you're

14   looking at, 7 would be you have a lot of sexual interest in

15   this individual.

16        It goes to the basic philosophical premise on

17   which this test is built that human sexual attraction falls

18   along a continuum.  I think it's arguable that it doesn't

19   follow along a continuum, that people are actually sexually

20   attracted to somebody or they're not sexually attracted to

21   somebody.  Differentiating whether you would have sex with a

22   two-year boy or a five-year old girl is something that is

23   quite alien to most people, but that's a premise on which

24   this test was based, so I challenged Dr. Abel, and Missouri

25   was his largest consumer.  He quickly went back and

1    statistically modified the test in order to compensate for

2    what was called the reflexive responder.

3            Now, the probability values are based on a

4    combination of the visual reaction time and the

5    questionnaire, so you would combine these two.  After he

6    made these statistical adjustments, we began to get all

7    kinds of strange responses on this probability index.  We

8    would have people who had never been accused of child issues

9    at all, suddenly coming out with 100 percent probabilities

10   or 100 percent probability on an extra familial girl and

11   zero on everything else.

12           We were looking at it and saying we can't made

13   head or tail of this, so we contacted Dr. Abel, and Dr. Abel

14   has been attempting to modify that, but as of currently even

15   he is saying don't use the probability values and don't use

16   the Denier-Dissimulator values because when they did the

17   statistical adjustments, it threw those things off, and the

18   norms can no longer be relied upon.

19   Q.   So, in the report that talks about for Mr. Lavely the

20   probability values and the den Ier desimilarity category

21   where percentages are given regarding Mr. Lavely under the

22   Abel, those percentage valuations are no longer in use under

23   the Abel test?

24   A.   That's correct.

25   Q.   So, the conclusions or the descriptions that Dr. Ball

1    made in the report concerning the probability values in the

2    Denier-Dissimulator category, what effect or use do you make

3    of them today regarding Mr. Lavely?

4    A.   Well, the only use that I made of them was I actually

5    called the statistician at Dr. Abel's office in Atlanta, and

6    I said okay, read off to me the specific responses that led

7    you to this conclusion, statistics aside, and he read off

8    the specific things, and they were things like I enjoy

9    children's theater.  Well, he does enjoy children's theater.

10   I enjoy taking pictures of children.  Well, he does enjoy

11   taking pictures of children.  I enjoy watching children.

12   Well, he's obviously watched children through his

13   involvement in children's theater.  It's one of these

14   situations where child molesters would say yes to those

15   things.

16          Child molesters might say I'm active in boy

17   scouts, I work in my children's Sunday school; however just

18   because you're interested in those things does not mean that

19   you're a child molester.  Many, many, many more people are

20   interested in that than the very small percentage of people

21   who are interested in child molesters; however, these are

22   things because they correlate with child molestation in

23   Dr. Abel's development sample were then used to draw

24   conclusions about the probability values.

25          They were weighted less importantly until they

1    statistically adjusted, and those things just got popped up

2    a lot more.

3              THE COURT:  There has been no such challenge to

4    the penile plethysmograph approach, that is to say, about

5    the reliability in the report of December, 2003, it says

6    numerous scientific studies have demonstrated the

7    reliability and validity of the penile plethysmograph in

8    assessing sexual arousal patterns.  Have there been any

9    challenges to that?

10              THE WITNESS:  I'm sure there have been challenges

11    to that.  They would -- it wouldn't be as easy to challenge

12    that because not one -- the penile plethysmograph is

13    conducted by a whole bunch of different people.  It isn't

14    conducted by one company, like the Abel is conducted by one

15    company.

16    Q.  And, Doctor, are you aware that under the Daubert case

17    decided by the Supreme Court that the Abel Assessment has

18    been ruled inadmissible?

19    A.  In Massachusetts, yes it has, in the Reddy versus the

20    Commonwealth case, which was in late 2001 or early 2002.

21    Q.  Now, I take it that you have been treating Mr. Lavely

22    since 2003?

23    A.  Since April of 2004.

24    Q.  What's been the frequency of your meetings with

25    Mr. Lavely?

A.   Weekly.

Q.   Weekly.  And how long are your sessions?

A.   An hour.

Q.   And what recommendations do you have for the Court regarding a possible sentence of Mr. Lavely based upon your treatment of him?

A.   Well, one of the things that we always do is we consider the risk to public safety because when you're treating sex offenders, one of the differences in treating sex offenders that is different than just providing mental health public safety is an overriding concern, and so we always, when we're treating these people, do a risk assessment to see what level of risk we're dealing with and then what kind of constraints we might be placing on somebody looking at high risk situations.

In conducting the risk assessment, we usually use actuarial kinds of data to estimate, and then we look at mitigating or aggravating circumstances to derive a risk assessment.  We would in the first place consider this individual an extremely low risk to re-offend, and then we would look at things like dealing with him helping him understand why he got involved in this behavior in the first place, but, more importantly, helping him devise a relapse prevention plan that would keep him out of any kind of high risk situation and also informing him of a support team of

1    those kind of things so that they could help him to engage

2    in avoiding those high risk situations and utilizing

3    appropriate interventions.

4              THE COURT:  But your risk assessment is based on

5    your clinical judgments?

6              THE WITNESS:  No, it's based on actuarials, in

7    this case, a static 99, then that would give us a basic

8    score, then we would mitigate or aggravate it by what.

9              THE COURT:  It's a score by what, characteristics

10   by other correlated with recidivism?

11             THE WITNESS:  Correct.

12             THE COURT:  To what degree, if any, did you

13   consider the Stoughton charges, or did you not consider the

14   Stoughton charges, in any case?

15             THE WITNESS:  Well, in conducting the risk

16   assessment and just in our treatment in general.

17             THE COURT:  Okay.

18   Q.  And what were your reasons for concluding that it has a

19   low risk of recidivism?

20   A.  The two kind of overriding factors that you look at and

21   other factors derive from that, but the two basic phenomenon

22   looked at, does this person have deviant sexual arousal, and

23   does this person have antisocial traits, so would he have

24   motive to engage in deviant sexual arousal, and does he lack

25   the impulse control, the judgment, the basic empathy to

1    actually go ahead and act out upon that, and, of course,

2    those all range upon a continuum.

3        We also look at things like age, was the victim

4    male, which is correlated with higher recidivism, was the

5    individual a stranger?  Some of these it's difficult to

6    calculate on when you have internet issues, so, you know,

7    who exactly was the victim.

8        In this case, no one has suggested that this

9    individual has victimized males, strangers, that kind of

10   thing, so, looking at past history, does he have property

11   offenses, things like does he, you know, has he ever used

12   weapons, these kind of things.  Of course, the population

13   you're dealing with can range from model citizens to

14   horrendous criminals, but those are the kinds of things that

15   you look at and address in treatment.

16   Q.  And on these issues that you have been treating

17   Mr. Lavely on, has he made progress?

18   A.  Yes, he has.

19   Q.  And has he taken the treatment seriously in your

20   opinion?

21   A.  Absolutely.

22   Q.  Has he had the support of his wife?

23   A.  Absolutely.

24   Q.  In your letter, which is attached to the submission that

25   I made to the Court, you stated, "Based upon my professional

1  observation, I feel that he would be better managed in the

2  community with continued counseling; furthermore jail

3  sentence is counterindicated by his evaluation and

4  treatment."  What are your reasons for that?

5  A.  Well, looking at incarceration from a purely how is this

6  going to play into his recidivating in the future, how is it

7  going to play in his rehabilitation placing him in

8  incarceration, he would be deprived of sex offender

9  treatment, he would be deprived of, you know, then you've

10  got to deal with the possible blow to his self-esteem, the

11  trauma that might be produced by the jail situation as well

12  as his, you know, developing, you know, possibly all kinds

13  of worries about his family.

14       It simply would not enhance his rehabilitation as

15  a sex offender and would do very little to lower his

16  recidivism rate when he got out in the community.

17       THE COURT:  But that doesn't apply to everyone

18  going to jail?

19       THE WITNESS:  No, it doesn't because I would

20  argue, for example, that having been for 10 years in

21  Massachusetts the director of a center for sex offenders

22  that most of the sex offenders who came into that situation

23  benefited from being in that six-year intensive treatment

24  program.

25       THE COURT:  Isn't it also the case, and I have to

1     put this on the table as being something I have heard of,

2     and you can address it or not, when I was a practicing

3     lawyer and the concept of sexually dangerous persons was

4     seen as a syndrome that was used to institutionalize people

5     in the treatment center, the notion was that there was a

6     category of sexually dangerous persons that might even have

7     a psychological syndrome to it, and that was part of the

8     reason why there was specialized treatment.

9             It later turned out that there really was no

10    psychological syndrome known as sexually dangerous person,

11    in other words, there was no single set of psychological

12    characteristics that fit everyone in this category so that

13    you could appropriately call it a syndrome like that of a

14    battered women syndrome or posttraumatic stress.  Isn't that

15    the case?

16            THE WITNESS:  Of course, they reinstituted the

17    commitment, we're back there.  Probably I spent half my

18    time, in fact, I just came last week from Washington where I

19    was on the stand for three days in a commitment proceeding.

20    They now have gone back, and what they're looking at now are

21    does this person have a pedophilia?

22            THE COURT:  Which means?

23            THE WITNESS:  That's the American Psychiatric

24    Association, The DMS-4, which is the big book that outlines

25    all of the mental illnesses, so is this person a pedophile?

1          THE COURT:  Pedophilia?

2          THE WITNESS:  Is he sadist?  It could be any one

3    of the pedophilias.  Is that combined with an antisocial

4    personality disorder?  Those two things are probably the

5    most common sets of mental illnesses, so actually we're

6    right back where we have to prove or disprove that this

7    person has a mental disorder or a personality disorder that

8    makes it likely that this person will engage in sexually

9    dangerous --

10          THE COURT:  You found no psychological or

11    personality disorder in Mr. Lavely?

12          THE WITNESS:  None.

13          THE COURT:  Part of the other problems with child

14    offenses is that there is certainly a concern that there is

15    in fact no meaningful treatment, that is, there is in fact

16    no meaningful treatment, and, in fact, no meaningful way to

17    predict recidivism, and part of the reason why the penalties

18    for child pornography and child abuse have gone up

19    cataclysmically is because of the sense that all that

20    society can do is respond retributively, there really is no

21    meaningful treatment and certainly no meaningful prediction.

22    You disagree with both the treatment and the prediction

23    addiction issue?

24          THE WITNESS:  Absolutely.  Had I brought my other

25    suitcase, I would have had all the research right in there

1    that we took to Washington.  There are at least, minimally

2    speaking, 15 well-established research projects including

3    meta-analyses would show that treatment probably reduces

4    recidivism in half.

5            One of the basic, the interesting things that most

6    people are unaware of is that most sex offenders even

7    without treatment have a very low recidivism rate, and so

8    sometimes the effective treatment can't be shown because we

9    have such a low base rate to begin with, but, for example,

10   the program that I started in Massachusetts, not in

11   Massachusetts, in Washington, which I started in 1988, has a

12   2.8 percent recidivism.

13           The program that I operated in New Jersey, which

14   was the adult diagnostic and treatment center, which had the

15   only men, there were people who were judged by the Court to

16   be compulsive and repetitive offenders.  It wasn't a civil

17   commitment, but if you came into the criminal courts, the

18   Judge could ask for an evaluation.  If you were judged to be

19   repetitive and compulsive, you were sent to ADTC.  A 10-year

20   follow-up on that program showed a 9 percent recidivism

21   rate.

22           Even in Massachusetts, the men who went through

23   the inmate part of our treatment program and then went out

24   to intensive parole have a zero percent recidivism after

25   it's probably about eight years at this point.

1          Also, because of involuntary commitment and more

2     probably because of public notification and sex offender

3     registries, several actuarial risk assessments have been

4     developed which do have predictive value.

5          THE COURT:  The allegation suggests that this had

6     been going on from 1997; is that right?  The notion is it

7     was not just the controlled delivery in 2003 but the reports

8     from the distributor of the pornography suggested that this

9     had been going on from '97 to --

10          MR. DELINSKY:  -- '99.

11          THE COURT:  Then again in 2003 a total of $3,000

12     had been spent on this material?

13          MR. DELINSKY:  Correct.

14          THE COURT:  $3,375.  Does the length of the time,

15     does the indulgence have any impact on your analysis?

16          THE WITNESS:  It would not only have impact if he

17     had been caught and somehow treatment sanctioned and

18     received treatment and then returned to that.  You almost

19     universally with sex offenders, once you look at the initial

20     issue, there are going to be other things in the past that

21     have gone on.

22          As long as it's something that didn't receive

23     treatment and then pick up again, that would not

24     particularly concern me at all.

25          THE COURT:  Okay.  I have no further questions.

1           MR. DELINSKY:  I think I'm about done.

2           THE COURT:  Mr. Feeley, would you like to proceed?

3           MR. FEELEY:  I would, your Honor.

4                        CROSS-EXAMINATION

5    BY MR. FEELEY:

6    Q.  How long has Mr. Lavely had an interest in child

7    pornography?

8    A.  Well, he's been looking at adolescent girls over a

9    period of time such as we just mentioned.

10   Q.  Did it predate 1997?

11   A.  I'm not sure.

12   Q.  Well, have you gone into a history of Mr. Lavely of his

13   interest in child pornography?

14   A.  Yes.

15   Q.  Then I'll ask you again, does his interest predate

16   1997?

17   A.  I would have to look at my therapy notes.

18   Q.  You are aware, as the Judge just asked, that he in fact

19   in a two-year period of time spent $3300 to obtain child

20   pornography from a child pornography business?

21   A.  Yes, he mentioned that he had ordered from that company

22   before.

23   Q.  Right.  Did you know that it was $3300 worth of tapes?

24   A.  I don't know that I knew that specific figure.  I knew

25   that -- I know that child pornography is an expensive

1    proposition.

2    Q.    Not on the internet, it's free?

3    A.    Depending what you access on the internet, there are

4    paid sites, so it can be a significant expense.

5    Q.    Well, you can subscribe to sites?

6    A.    That is correct.

7    Q.    Certainly $3300 is a substantial amount of money for

8    child pornography, correct?

9    A.    I don't know it's a significant amount of money

10   period.

11   Q.    Were you aware that over that two-year period he ordered

12   videotapes from that company on 13 separate occasions?

13   A.    He told me he ordered videotapes from that company

14   repeatedly.

15   Q.    Because that's a, you know, that's somebody who is

16   receiving something, apparently liking it and then ordering

17   more; is that correct?  Isn't that what you would assume

18   from the 13 orders over a two-year period of time?

19   A.    I would presume that, yes.

20   Q.    So, there must have been something about that he liked

21   or he was attracted to that with make him want to continue

22   to send money on repeated orders over an extensive period of

23   time; is that right?

24   A.    Correct.

25   Q.    Then in 2003, did he tell you he received a single

1   solicitation for child pornography and that he responded to

2   it immediately?

3   A.   Yes.

4   Q.   And did he tell you that he sent $765 on that occasion

5   to get additional child pornography?

6   A.   Yes.

7   Q.   Have you ever seen a description of the -- they weren't

8   videotapes, the CDs that he ordered in 2003?

9   A.   He's just described what he could remember of the tapes

10  stated.

11  Q.   What did he tell you about the ages of the people

12  depicted, the persons depicted in the CDs that he ordered?

13            MR. DELINSKY:  Well, just so that I can be clear,

14  he never received those, so there's no evidence that he ever

15  viewed them.

16            MR. FEELEY:  We're talking about an interest, your

17  Honor.

18            MR. DELINSKY:  But the controlled delivery, Judge,

19  he never received these.  So, there's no evidence -- as soon

20  as he picked them up from the postal service, he was

21  detected.

22            THE COURT:  I think I can take judicial notice of

23  the descriptions on pages 4, 5 of the presentence report.

24            MR. FEELEY:  On 3 and 4 is the product list, your

25  Honor.

1      THE COURT:  The product list, yes, okay.

2   Q.  Did he tell you the ages of the persons?

3   A.  The one that stands out in my mind is a 12-year old

4   girl.

5   Q.  Did he tell you one of the videos involved a 10-year old

6   girl?

7   A.  Not to my recollection.

8   Q.  And did he tell you that these videos included sexually

9   explicit conduct?

10  A.  Yes.

11  Q.  These were not just nudist videos?

12  A.  Yes, he did tell me that.

13  Q.  They were just not posed videos, there was oral sex on

14  these videos.  Did he tell you that?

15  A.  Yes, he did.

16  Q.  And genital sex or intercourse in these videos as well;

17  did he tell you that?

18  A.  He did not tell me that, but he did tell me that there

19  was oral sex.

20  Q.  Did he tell you that one of the videos or CDs involved a

21  young girl and a cucumber?

22  A.  No.

23  Q.  Now, did you have any interest in what the descriptions

24  of the child pornography that Mr. Lavely wanted to view?

25  Did you have any interest in what exactly it was that he

1    wanted to view?

2    A.   Had I suspected that it was sadistic material, I would

3    have had an interest in that.   Otherwise, you expect to find

4    a broad range of interest when you're dealing with internet

5    pornographers.

6    Q.   Now, in your letter to the last sentence or the last

7    sentence of the last paragraph said furthermore a jail

8    sentence is counterindicated by his evaluation and

9    treatment.   Can you articulate his evaluation for us,

10   please?

11   A.   Well, his evaluation was primarily looking to see on the

12   plethysmograph, and when we were using the Abel at that

13   point to see if there was indeviant arousal, since as part

14   of ongoing treatment, we've done an ongoing evaluation of

15   whether we believe this person is a pedophile.

16            That's probably the most relevant issue when

17   you're dealing with cybersex and internet sex, is this

18   person actually a pedophile who is being aroused by this

19   kind of material, or as the research now indicates more, is

20   this kind of a separate parallel behavior that doesn't

21   translate into direct actions?

22   Q.   What was your conclusion with respect to Mr. Lavely?

23   A.   That he is not a pedophile.

24   Q.   Now, did you ask him whether he was aroused by any of

25   the child pornography that he viewed?

1    A.   Yes, I did.

2    Q.   What was his answer?

3    A.   He stated that he was occasionally aroused by the

4    adolescent but not the child.

5    Q.   And what do you define as adolescent?

6    A.   Post puberty.

7    Q.   Now, do you know that some of what he ordered was

8    prepubescent?

9    A.   Yes.

10   Q.   Do you have an explanation for why he would order

11   prepubescent porn if that wasn't of interest to him?

12   A.   Well, it's believed that there are people who simply

13   enjoy looking at curious or unusual kinds of sexual

14   depiction.  That does not make somebody a pedophile.

15   Q.   Well, you wouldn't term Mr. Lavely a curiosity, would

16   you?

17   A.   It is felt when they identify types of individuals that

18   there are types of individuals who are simply -- they are

19   attracted to unusual depictions in the media, and media

20   being computer or video, that they're just attracted to

21   unusual kinds of sexual behavior.  This is not considered

22   particularly -- hasn't been identified as pedophilia.

23   Q.   Well, you know that the child pornography that he

24   ordered focused on young girls, do you not?

25   A.   And primarily adolescent girls.

1  Q.  And you know that he has no interest, sexual interest in
2  young boys?
3  A.  Not that we've ever -- has been identified in any way.
4  Q.  All right.  So, he has acknowledged, at least in some
5  instance, sexual interest or sexual arousal to young girls,
6  minor girls; is that correct?
7  A.  No, he says that he is interested in adolescent girls.
8  He does not admit to being sexually aroused by depictions of
9  prepubescent.
10  Q.  Well, you've told us what happens in some instances.
11  What is it Mr. Lavely says interests him in 10-year old
12  girls or 12-year old girls?
13  A.  That that was just part of a broader collection of
14  material.
15  Q.  Now,  --
16  A.  It really wouldn't change our treatment unless we
17  diagnosed him as a pedophile.
18  Q.  Now, you know when he ordered the $765 of CDs, including
19  depictions of a 10-year girl, 11- to 13-year old girls, a
20  12-year old girl, this is what he ordered.  You knew that?
21  A.  Yes.
22  Q.  No, actually you told me you didn't know that?
23  A.  Well, a 12-year old girl was the youngest that he
24  identified.  It wouldn't have made any difference to me
25  whether it was a 10 or 12-year old.

1   Q.  Do you consider a 12-year old girl pubescent or

2   prepubescent?

3   A.  I would assume that that individual is prepubescent.

4   Q.  Mr. Lavely's latest interest, at least based on his

5   purchase of child pornography, involved depictions of a

6   12-year old girl, 11- to 13-year old girls and a 10-year

7   girl?

8   A.  Among other things.

9   Q.  Among other things.  But that's what his most recent

10   purchase was?

11   A.  Right, among other things.

12   Q.  He didn't recently purchase depictions of 15-,

13   16-year-old girls, did he?

14   A.  It is my understanding that those were included in that

15   material.

16   Q.  Well, the material that he ordered -- I can show you the

17   product listing.  Why don't I do that.  Now, from that list,

18   Mr. Lavely ordered six or seven CDs.  Now, having read that

19   list, does that better inform you as to what his sexual

20   interest in children was, what the age focus of his sexual

21   interest in children was back in April, 2003?

22   A.  Well, it looks like just prepubescent to just

23   postpubescent.

24   Q.  Now, at the same time --

25          MR. FEELEY:  Maybe we'll mark that as an exhibit,

1    if we could, your Honor.

2            THE COURT:  Absolutely.

3    Q.  At the same time --

4            THE COURT:  I'm concerned about the time for the

5    motion to suppress and the prisoner in the dock.

6            (Discussion was held off the record.)

7            ( Two-page document was marked Government Exhibit

8    No. 2 in evidence.)

9            THE COURT:  What I plan to do is I will let

10   Mr. Feeley quickly examine and to stop so this witness will

11   not have to return.

12   Q.  At the same time Mr. Lavely placed this order in 2003,

13   are you aware he had a substantial amount of child

14   pornography on his computer?

15   A.  He stated he did, he had child pornography on his

16   computer.

17   Q.  Did he tell you anything about the ages or the type of

18   pornography that was on his computer?

19   A.  Well, he stated that he had a very large collection of

20   depictions of adolescent girls, and when he would download

21   some of those from these trading groups on the internet that

22   there was child pornography on there.

23   Q.  Did he suggest to you that it was somewhat inadvertent

24   that he had child pornography on his computer?

25   A.  That he would download files and that some of those

1    files did have child pornography on them.

2    Q.  Well, do you have reason to question the inadvertence of

3    child pornography on his computer given the fact at the same

4    time he's specifically ordering off a product list child

5    pornography involving 10- to 13-year old girls?

6    A.  Well, it wouldn't surprise me if he had intentionally

7    downloaded similar material.

8    Q.  Despite the fact that he was telling you it was

9    completely inadvertent, that wouldn't surprise you at all?

10   A.  No.

11   Q.  Because it's somewhat unsurprising when you deal with

12   child pornography persons that they might tend to minimize

13   their own culpability; is that true?

14   A.  Yes.

15   Q.  Now, Dr. Ball's report is not a full sex offender

16   treatment evaluation or sex offender evaluation, is it?

17   A.  No, it's not.

18   Q.  It's really just two tests, right?

19   A.  Right, she was doing this at the request of

20   Dr. Stephen Shapse.

21   Q.  Have you reviewed his report?

22   A.  No, I don't have access to that.

23   Q.  Now, generally a sex offender evaluation would include

24   complete history of Mr. Lavely's interest in such things as

25   child pornography, wouldn't it?

1    A.   Correct.

2    Q.   That's not in Dr. Ball's right?

3    A.   No, that is in I presume Dr. Shapse's report.

4    Q.   Dr. Ball very carefully said this evaluation, meaning

5    hers, is to be used only in conjunction with Dr. Shapse's

6    report?

7    A.   Yes.

8    Q.   And she further said it should not be taken out of

9    context and should not stand alone; is that right?

10   A.   Correct.

11   Q.   Now, you've never seen Dr. Shapse's report; is that

12   right?

13   A.   No.

14   Q.   So, you don't know whether Dr. Shapse has determined

15   whether Mr. Lavely is a pedophile, do you?

16   A.   No, I do not.

17            MR. DELINSKY:   Judge, if I could clarify,

18   Dr. Shapse is a psychologist who I hired to help me, and he

19   was the one that I recommended that I send Mr. Lavely to

20   forensics.  Also, Mr. Feeley had recommended that, and

21   Dr. Shapse helped me in interpreting certain things, but he

22   performed no independent evaluation, that's why I had

23   Mr. Lavely begin treatment with Dr. Schwartz, so I just want

24   to clear that up.

25            THE COURT:   Okay.

1           MR. DELINSKY:  That there is no such report.

2           THE COURT:  There is no report, okay.

3    Q.   Now,   --

4           THE COURT:  Then that suggests that the full sex

5    offender report, that there is no full sex offender report

6    is what Mr. Feeley's point is.  Okay.  Go on.

7    Q.   Now, you mentioned earlier Mr. Lavely takes pictures; is

8    that correct?

9    A.   Yes.

10   Q.   And has he told you that?

11   A.   Yes.

12   Q.   And has he told you that he takes pictures of young

13   girls?

14   A.   Yes, adolescent girls.

15   Q.   Has he told you he takes pictures of young boys?

16   A.   No.

17   Q.   Now, has he told you about his involvement in little

18   theater?

19   A.   Yes.

20   Q.   Now, what has he -- well, let me ask this.  You know

21   that his involvement with little theater brought him in

22   close contact and sometimes unsupervised contact with young

23   girls, you know that?

24   A.   I might question whether it was totally unsupervised

25   having been very active in theater myself, there's rarely a

1   time back stage when you are totally unsupervised.

2   Certainly, it was children's theater, they were primarily

3   adolescent girls.

4   Q.  Do you think it would be appropriate today for

5   Mr. Lavely to be involved with a little theater involving

6   young to adolescent girls?

7   A.  Today?  Do I think today he should be involved?

8   Q.  Yes.

9   A.  No.

10  Q.  Why not?

11  A.  Because it would be a high risk situation for being at

12  least accused of inappropriate behavior.

13  Q.  Now, there is some correlation, is there not,

14  between -- well, strike that.  Let me start over again.  Do

15  you view Mr. Lavely's extensive involvement in the little

16  theater to be at all related to his interest in young to

17  adolescent females?

18  A.  I don't believe that Mr. Lavely's motivation for being

19  involved in little theater was to expose himself to

20  adolescent females.

21  Q.  You don't think so?

22  A.  Only in the sense that you might enjoy being with

23  children and, therefore, you would be involved in little

24  theater.

25  Q.  Well, do you know of any interest he had involving

1  himself with young boys?

2  A.   Well, I'm sure that there were boys in that theater

3  group, so if he was interested in working with children in

4  theater, I don't think he excluded, but he's quite candid in

5  the fact that he enjoys being around adolescent girls, he

6  enjoys aesthetically taking pictures of adolescent girls.

7  Q.   Now, persons with sexual interest in children often

8  involve themselves in children activities; isn't that

9  true?

10  A.   I don't know they often do.  When you look at the entire

11  group of child molesters, it's probably actually a

12  relatively small percentage that informally involve

13  themselves.  When you exclude incest offenders and people

14  who molest their neighbor's children, it's not the majority,

15  by any means.

16  Q.   But it's not uncommon, for instance, for a man with a

17  sexual interest in young boys to coach little league, is

18  it?

19  A.   There are certainly subtypes of groups of child

20  molesters who get their victims by involving themselves in

21  children's activities.

22  Q.   But even set aside those predators seeking to obtain

23  victims to molest, is there not a correlation between just a

24  sexual interest in children and wanting to have the

25  opportunity to be with and near them?

1   A.  Well, I think we should distinguish between prepubescent
2   and postpubescent.  Postpubescent girls, sexual
3   postpubescent girls is not considered a deviation.
4   Q.  Well, would you consider that somebody interested in
5   those videotapes to not have a deviation of some sort?
6   A.  Well, that's getting back to how many people who engage
7   in cybersex are actually doing so because they have a
8   pedophilia, and the research suggests that there are
9   multiple reasons why people would access child pornography,
10  not necessarily having to do with they're suffering from a
11  pedophilia.
12  Q.  If I may, what I've marked as Exhibit 2 does not suggest
13  an interest in 15- and 16-year old girls, does it?
14  A.  There's probably one or two 14, 15.  The majority are
15  prepubescent.
16  Q.  Right.  So, that falls outside of what you're suggesting
17  to be a fairly normal adult male interest in older
18  adolescent girls?
19  A.  I was referencing more his interest in the theater.
20  Q.  So, you are aware of and have given your opinions today
21  in light of knowing of his long-standing interest in child
22  pornography; is that correct?
23  A.  His somewhat interest in child pornography among his
24  interest in also viewing just regular pictures of adolescent
25  females.

1    Q.   But you would agree that the interest that's been at

2    least discussed between you and I including, you know, now

3    upwards to $400 of purchases of child pornography is fairly

4    extensive and long-standing; do you not agree with that?

5    A.   I would say it was significant.   I would be reluctant to

6    compare it to the average person involved in this.   I would

7    say it's significant.

8    Q.   Do you have any reason to want to know whether

9    Mr. Lavely's interest in child pornography existed between

10   1997?

11   A.   I would be interested.

12   Q.   Did you ask him?

13   A.   He made some illusions to that, but it was mainly in the

14   context of talking about being interested in viewing

15   adolescent females from a more portraits-aesthetics kind of

16   approach.

17   Q.   Is it common for persons with a sexual interest in

18   children to try to minimize their interest and the extent of

19   their interest in children?

20   A.   Yes.

21   Q.   But you've never pushed Mr. Lavely to actually determine

22   when his, at least, child pornography interest began?

23   A.   It really wouldn't affect his treatment at all.

24   Q.   Now, you say he's not a pedophile; is that correct?

25   A.   That's my opinion.

1    Q.  But you do knowledge, I believe, that he has an

2    interest, a sexual interest in adolescent children; is that

3    correct?

4    A.  Yes.

5    Q.  Adolescent females?

6    A.  Adolescent females, yes.

7    Q.  Are you telling us that sexual interest in adolescent

8    females extends to 12-year old females?

9    A.  We don't have any concrete evidence that it does.  It

10    would probably depend -- probably I would need to see slides

11    of individuals that he was interested in and then see a

12    picture of that 12-year old.

13    Q.  But wouldn't you consider this concrete interest in

14    sexual, concrete interest in a 12-year old girl or a 10-year

15    old girl or an 11-year old girl?

16    A.  To some extent, but whether that has to do with being a

17    pedophile or not or whether it has to do with somebody being

18    interested in unusual depictions of different kinds of

19    sexuality, that's the big question in the field.

20    Q.  Well, do you think those descriptions are -- do they

21    describe unusual depictions, setting aside the cucumber

22    description?  You suggested he might have an interest in

23    unusual depictions?

24    A.  Well, I think this would be unusual depictions for

25    anyone.  The idea in studying people who are into cybersex

1    the current research shows that there are a number of

2    different -- there's a typology of individuals who order

3    this, and among those, there are hard core pedophiles who

4    are looking at it.  There are people who are just stimulated

5    by unusual kinds of sexual depictions.  I would consider

6    this unusual sexual depictions.

7    Q.  Isn't this pretty straightforward child porn?

8    A.  Child porn is unusual depictions.

9    Q.  So, anyone who -- are you saying that any child porn

10   would qualify under your kind of unusual depiction exception

11   to child interest?

12   A.  I am just saying there is considered to be a type of

13   cybersex offender who is excited by out of the usual adult

14   consenting, you know, or explicit, that they're aroused by

15   unusual depictions, they might be aroused by bestiality,

16   they might be aroused by a number of different.

17   Q.  Why do you call it cybersex when this was a mail order

18   video or a CD?

19   A.  I'm referring to what he had on his computer.  In

20   generic, we would consider that part of the dynamics of

21   cybersex.

22   Q.  Now, given the fact that you have now looked at the

23   order form that Mr. Lavely used in April of 2003 for the

24   first time, can you please characterize, if you can, for us,

25   what Mr. Lavely's interest in 10- to 13-year young old

1   females is?

2   A.   I don't understand your question.

3   Q.   Well, is it just a curiosity interest, or do you think

4   there's a sexual interest now that you have actually seen

5   the document from which he ordered $765 of child

6   pornography?  Now that you've seen it, do you think that he

7   has a sexual interest in 10- to 13-year old young girls?

8   A.   The question then goes back to is it a pedophilic

9   interest, does the man suffer from a pedophilia, or is he

10  stimulated by unusual depictions of a variety of sexual

11  acts?

12  Q.   You don't know which it is, as you sit here today?

13  A.   Probably not.

14          MR. FEELEY:  I have nothing further.

15          THE COURT:  Thank you very much.

16          MR. DELINSKY:  Thank you, Doctor.

17          THE COURT:  Let me briefly, because I don't want

18  to affect the next case, tell you about the things that I'm

19  at least considering.  In the absence of a formal departure

20  motion, I was fully intending to sentence, given the

21  guideline range, and I say that because I want to make

22  certain that you understand the seriousness of the

23  situation, and I will make sure that our procedure order

24  reflects more than deals with this ambiguity, here is the

25  seriousness of the situation.

1          The guidelines already said that there is a

2     difference between people who are essentially lookers and

3     people who are doers, and the range that had been set aside

4     were for the people who were the lookers.

5          So, it's not enough to say that he should be

6     outside of this range because he's not a predator because

7     presumably this was the range that had been set aside for

8     just people like this.  So, I want to understand what other

9     judges have done in like cases with people who have been --

10    I want to call in some passive viewers of prepubescent

11    children, what other judges have done in like cases, have

12    there been any departures in like cases pre-Booker, what is

13    the legislative history of the statute that gave rise to

14    this, did Congress mean to criminalize, not to criminalize,

15    did Congress mean to heavily punish people who had,

16    accepting everything that Dr. Schwartz said, an interest in

17    viewing prepubescent children.

18          In other words, what is it about this case that

19    would make him any different than anyone else in this

20    situation because if I can't find an answer to that

21    question, then all that I will be doing is saying I don't

22    think people who are just lookers and not doers should be

23    punished to this extent.  And as I have said to you many

24    times, I don't think that people should be punished to this

25    extent, but that is not -- I don't even think that Booker

1    opened that up.  That is a judgment for judges to make.

2         So, what is the legislative history?  You've

3    mentioned to some degree impact of his imprisonment on the

4    rest of his family.  I think you have to go back to think

5    about the usual categories and see if there's more

6    information that you want to give me on those categories,

7    not for the purposes of sort of finding some way out of the

8    sentencing guidelines but for me advisory means that in

9    general they are not inappropriate, but in particular

10   situations, they may not make sense, and you have to give me

11   a reason for why they don't make sense in this situation.

12   And I can't say that I have seen that yet given what I have

13   heard.  I'll delay this.

14        Mr. Feeley, you sound like you're coughing

15   constantly, in any event, just for your health, I should

16   delay this.

17        MR. FEELEY:  My apologies.

18        THE COURT:  Maryellen, give us another date in

19   March.  March 22d at 2:30; is that doable?

20        MR. DELINSKY:  Yes, Judge.

21        THE COURT:  Let me also say that I have no doubt

22   that this case and cases like it are the most difficult

23   post-Booker cases, most difficult, because it seems so

24   abudantly clear that Congress has intended to be --

25   Congress, the Commission, all particularly harsh with

1    respect to this category of offender, so you have to do much

2    more.

3            MR. DELINSKY:  Yes, I understand, and thank you,

4    your Honor.  This is an area that obviously I have not seen

5    clear direction.

6            THE COURT:  I haven't given clear direction.  As I

7    say, I'm sitting on this intergalactic decision, which I

8    will release at some point.

9            MR. DELINSKY:  So, within two weeks of that

10   hearing I will file a detailed motion.

11           THE COURT:  Mr. Feeley, you will as well, or do

12   you want to simply resopnd?

13           MR. FEELEY:  I would want to respond, your Honor,

14   I believe that that would be more appropriate.

15           THE COURT:  I also would say that probation could

16   well work with you.  It may be differences have already

17   emerged in other cases or even differences between cases

18   have emerged.  Again, the category we're talking about is

19   somebody who, putting the Sutton case aside, because it's an

20   unresolved matter, someone who has obviously an interest in

21   looking at child pornography, which is precisely what

22   Congress was concerned about, because behind the child

23   pornography is a real child.

24           What is the range offenders within this and where

25   does he fit in that range and is he any different than any

57

1   of the others?

2           MR. DELINSKY:  I understand.

3           THE COURT:  Thank you very much.

4           THE COURT:  We'll take a second to set up for the

5   next case.

6           (Whereupon, the hearing was adjourned at

7   4:19 p.m.)

8                   C E R T I F I C A T E

9

10  UNITED STATES DISTRICT COURT )

11  DISTRICT OF MASSACHUSETTS     )

12  CITY OF BOSTON                )

13

14          I, Valerie A. O'Hara, Registered Professional

15  Reporter, do hereby certify that the foregoing transcript

16  was recorded by me stenographically at the time and place

17  aforesaid in No. 03-10323-NG-2, In Re:  United States vs.

18  Anthony Lavely and thereafter by me reduced to typewriting

19  and is a true and accurate record of the proceedings.

20          In witness whereof, I have hereunto set my hand

21  this _31st_ day of _March_____, 2005.

22

23              _Valerie a. O'Hara_____

24              VALERIE A. O'HARA

25              REGISTERED PROFESSIONAL REPORTER

## INDEX

**EXAMINATION**

| Witness Name | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| BARBARA SCHWARTZ, Ph.D | | | | |
| By Mr. Delinsky | 13 | | | |
| By Mr. Feeley | | 35 | | |

**EXHIBITS**

| Exhibit | Description | Identification | Evidence |
|---|---|---|---|
| Government Exhibit No. 2 | Two-page document | | 43 |

**EXHIBITS**

| Exhibit | | Page |
|---|---|---|
| Defendant No. 1 | Entered into Evidence | 15 |