UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
        V.               )    CRIMINAL NO. 04-10025-NG
                         )
ANTHONY LAVELY           )

**GOVERNMENT'S SENTENCING MEMORANDUM AND
OPPOSITION TO DEFENDANT'S DOWNWARD DEPARTURE MOTIONS**

The government hereby submits this sentencing memorandum:
(1) in opposition to defendant Anthony Lavely's ("Lavely")
various arguments that this Court depart or deviate from the
advisory guideline sentencing range; and (2) in support of the
imposition of a term of incarceration at the low-end of the
applicable GSR.

There is no dispute in this child pornography case that the
applicable guideline sentencing range is 21-27 months. [PSR,
¶80].  But it is important that this Court fully understand the
offense conduct that supports the guideline calculations.

**Offense Conduct**

Law enforcement authorities learned about Lavely through an
investigation of C.R.T., an ongoing child pornography production
and distribution business run out of Miami, Florida.  C.R.T. is
short for "Cultural Research Team," and was operated by Angel
Mariscal ("Mariscal").  When Mariscal was arrested in Miami in
September 2002, he admitted that he was in some of the videos
having sex with the girls and that the videos were made overseas.

Later investigation identified more than 175 child victims, the vast majority of which were females aged 9-16 from Cuba and Ecuador.  The child pornography was personally produced by Mariscal and others, smuggled into the United States, duplicated in VHS video and DVD formats, and sent to customers who placed orders in response to mailed advertisements.[1]

Search warrants executed during the course of the C.R.T. investigation resulted in the seizure of a C.R.T. customer list, which included Lavely's name and the post office box address he utilized.  Seized records of C.R.T. also included order and shipping forms, and showed that between December 10, 1997 and November 1, 1999, Lavely placed 13 separate orders with C.R.T., spending $3,375 on its products.

As a result of the C.R.T. investigation and Mariscal's arrest, the U.S. Postal Inspection Service conducted an undercover operation that contacted individuals that were identified from C.R.T.'s customer and order records.  The undercover solicitation and order form were nearly identical to the advertisements/offers of material for sale that Mariscal used when he was in business.  The undercover solicitation to Lavely was sent on April 8, 2003.  It was the only law enforcement contact directed to Lavely that occurred prior to his response to

---

[1]Although the details about Mariscal are not included in the PSR, the information was provided to Lavely's counsel, at his request, by a letter from the government dated April 26, 2005.

the solicitation.  Lavely responded to the undercover
solicitation one week later, on April 15, 2003.  The solicitation
is essentially a product listing of child pornography available
for purchase.  The products include detailed descriptions of the
ages of the persons involved and the conduct depicted on either
VHS video tapes or CD's.  Lavely, based on the single
solicitation, ordered eight CD's and enclosed the full price of
$765 in cash.  The minor females depicted in the ordered CD's
were described as follows: "a 12 year old cutie;" "some even
younger that [the 12 year old cutie];" "pretencious young girls
11-13 years old;" and "a very young cutie about 10 years old."
[PSR, ¶13-14].

     When Lavely picked up his ordered child pornography and was
confronted by Postal Inspectors, his cooperation, contrary to his
claims, did not begin immediately.  He lied to the Inspectors and
stated that he was unsure of what was in the package.  He lied
again and stated he did not know anything about C.R.T.  It was
only when he was shown prior C.R.T. order forms that he
acknowledged prior purchases from C.R.T.

     Thereafter, Lavely did cooperate with the Postal Inspectors
and provided them with his laptop computer and some video tapes.
The laptop included over 600 images of child pornography. [PSR,
¶22].  At least one of the video tapes, which had been purchased
by Lavely at least four years previously from C.R.T., contained

child pornography. [PSR, ¶24].

### **General Observations**

With Lavely's offense conduct in mind, some initial comments
are worth making.  First, Lavely claims that his conduct "had
either no effect or a *de minimis* effect on the encouragement of
the production and distribution of child pornography."  That is
not so.  One can make that argument if a defendant limits his
collection of child pornography to images downloaded from the
Internet, many of which are recycled images that were taken
decades ago, and for which no money is now exchanging hands. In
those cases, the encouragement of further exploitation of
children by the production of new child pornography is not as
directly implicated.  But here, Lavely was paying substantial
sums of money to an ongoing child pornography business that was
producing its own child pornography.  Lavely, more than any child
pornography defendant in this District, was directly and
substantially contributing to the current exploitation of
children.  Lavely paid $3,375 to C.R.T. while it was in
operation, and was willing to pay an additional $765 to obtain
hardcore child pornography.  It is purchases like Lavely's that
directly fund and encourage the rape and exploitation of young
children.[2]

---

[2]Lavely cannot say that he did not know that C.R.T. was
producing its own child pornography.  The solicitation offered a
tape or CD of a 13 year old girl that would be produced according

4

Second, Lavely's willingness to pay substantial sums of money for child pornography is significant for a reason beyond his direct and substantial support of an ongoing child pornography business.  The government knows of no case in this District where a child pornography defendant spent, or was willing to spend, anything close to $4,000 on child pornography. This case is exceptional in this regard.  Child pornography is essentially free on the Internet.  Although there are some subscription child pornography web sites, almost all of the child pornography defendants in this District obtained all, or almost all, of their Internet child pornography, for free, and that includes video clips of sexually explicit conduct such as oral sex and genital intercourse.  And, it is not as if Lavely did not know how to obtain child pornography from the Internet; he is obviously, based on his employment, very computer savy, and actually had over 600 images of child pornography on his computer that he admitted he had downloaded from the Internet.  Despite that, he was willing to spend $4,000 on child pornography.  That type of expenditure helps define his sexual interest in children. Despite free Internet child pornography, Lavely was not satisfied, and wanted more, and was willing to pay substantial sums of money to obtain it.

Third, Lavely mischaracterizes himself as "a mere recipient

---

to a script provided by the purchaser.

5

of pornographic materials resulting solely from the government's unsolicited 'advertisement.'"  Lavely is a long-time collector of child pornography.  He obtained it during the 1997-1999 period from C.R.T.  We do not know, but his collection activities may have predated 1997.  But, we do know that Lavely obtained child pornography over an unknown period of time from the Internet. Even with respect to the latest order from the undercover operation, he is much more than a "mere recipient."  He received a single solicitation and immediately sent $765 in cash to obtain hardcore child pornography involving girls 10-13 years of age. Lavely's claim that he had not ordered from C.R.T. for almost four years before receiving the undercover solicitation is certainly not a mitigating factor.  It does not suggest that his interest in child pornography subsided and was only restarted by the government's solicitation.  During that time his interest in child pornography was apparently satisfied by the images he downloaded from the Internet.

Fourth, Lavely's reliance on Dr. Schwartz in mitigation of his conduct and in support of a non-incarcerative sentence should be rejected by this Court.  Dr. Schwartz's opinion, which she herself ultimately retracted, that Lavely is not a pedophile, is without justification.  First, Lavely chose never to have a sex-offender evaluation performed. [Hearing transcript, p. 44].  Dr. Ball of New England Forensic Associates only performed two

6

specific tests, despite her qualifications to perform a full sex-offender evaluation.  She did so at the request of Dr. Stephen Shapse, who was retained by Lavely, but who made no report about Lavely's sexual interests. [Id. p. 45-46].  Dr. Ball specifically said that her test results should be used only in conjunction with Dr. Shapse's report, which was never requested by Lavely, or obtained from Dr. Shapse or any other qualified sex-offender professional. [Id. at 45].  Second, the lack of information on which Dr. Schwartz based her initial opinion that Lavely is not a pedophile is shocking.  She basically relied on the information that Lavely provided her, despite her acknowledgment that child pornography offenders tend to minimize their own culpability. [Id. p. 44].  She was not sure whether Lavely's interest in child pornography pre-dated the document orders from C.R.T. (i.e., 1997). [Id. p.35]. She did not know that he had spent $3,300 on tapes from C.R.T. [Id. p. 35].  Although she knew he had ordered video tapes from C.R.T. repeatedly, she did not know he had done so on 13 separate occasions over a two year period of time. [Id. 36].  She did not know the content of the CD's Lavely ordered from the undercover operation, relying instead on what Lavely could recall of their contents. [Id. p. 37].  Lavely did not tell her that the ordered child pornography included depictions of a 10 year old girl. [Id. 38].  He did not tell her that one of the ordered videos involved a young girl and a cucumber. [Id. 38].

7

Dr. Schwartz apparently took Lavely's word for his contention that he was aroused by adolescent girls but not prepubescent girls, despite the fact that his order from the undercover operation involved almost exclusively prepubescent girls. [Id. p. 40]. Her assumption that the ordered child pornography focused primarily on adolescent girls was disproved by the product listing that was introduced at the hearing and established his interest in 10-13 year old girls. [Id. p. 40, 43]. Finally, after being confronted with the descriptions of the actual child pornography ordered by Lavely from the undercover operation, and being unable to articulate a reason why Lavely would purchase child pornography focused on prepubescent girls, Dr. Schwartz retracted her opinion that Lavely is not a pedophile and said that she probably did not know, as she sat in the courtroom that day, whether Lavely was a pedophile or merely stimulated by unusual depictions of a variety of sexual acts. [Id. at 53].

Fifth, Lavely's and Dr. Schwartz's claim that his conduct somehow falls outside the heartland of child pornography guideline provisions is simply wrong. The heartland is not limited to only those that use child pornography to prompt or assist in the molestation of children. In fact, the guidelines are set up in way that simple receipt or possession, without aggravating circumstances, is the heartland of the offense. Specific enhancements cover, and increase the punishment for

conduct beyond simple receipt.  See e.g. U.S.S.G. §2G2.2(b)(2)(C)
(distribution to a minor); §2G2.2(b)(2)(D) (distribution to a
minor to persuade, entice, coerce, to facilitate the minor to
engage in prohibited sexual conduct); §2G2.2(b)(4) (pattern of
activity involving the sexual abuse or exploitation of a minor).
Specific enhancements cover, and increase the punishment for
conduct beyond simple possession as well.  See e.g. U.S.S.G.
§2G2.4(b)(1) (prepubescent); §2G2.4(b)(2) (quantity of items
possessed); §2G2.4(b)(3) (use of computer).  Furthermore,
Lavely's significant financial support of an ongoing child
pornography production and distribution business puts him
squarely in the heartland of offenders who are targeted by the
child pornography laws: those whose interests and financial
support encourage the current and future exploitation of
children.

**Specific Departure Arguments**

Lavely starts his departure arguments with a recitation of
other child pornography cases in this District in which downward
departures have been granted.  The government is aware of
downward departure motions granted in this District over the past
decade, and acknowledges joining in some of those motions.[3]  The

---

[3]The fact that the government has on a number of occasions
joined in departure motions in child pornography cases should
suggest to this Court that the recommendation in this case is not
a knee-jerk, poorly considered recommendation.  Although the
government has been open to well-founded departure motions in

undersigned Assistant U.S. Attorney has handled more child pornography cases in this district than any other assistant, and was the prosecutor in all six of the post-1990 cases referenced in Lavely's memorandum.  The government is also aware of the same or greater number of cases in which downward departure motions have been rejected and significant prison sentences imposed. Suffice it to say, every child pornography case is different, and each turns, for sentencing purposes, on the unique facts before the court, both with respect to the offense conduct and the defendant's characteristics.  It can be said with a strong amount of confidence that the government has never agreed to a departure in an instance where the offense conduct and other facts known about the defendant suggest a strong sexual interest in children.

Many of the child pornography offenders in this district over the years have had significant mental health issues, separate and apart from their sexual interest in children.  Major depression, often exacerbated by a recent event in a defendant's life, has often caused an interest in adult pornography to "slide" into an interest in and a collection of child pornography.

Lavely is different from nearly every child pornography defendant prosecuted in this District.  As stated above, the

---

some child pornography cases, this is a case where the government strongly believes that a departure is not warranted.

10

government is not aware of any child pornography offender who has spent anything close to $4,000 for child pornography.  Second, the government is not aware of any child pornography offender who has so directly and substantially supported an ongoing child pornography production and distribution business.  Third, the government cannot recall a child pornography defendant who had a more stable, supportive, and outwardly healthy and successful personal and professional life than Lavely.  Lavely's life circumstances actually make his child pornography offenses more, and not less, egregious.  Lavely must be driven by an overwhelming sexual interest in children, given an absence of contributing mental health issues and his apparently satisfying personal and professional life, to risk all of that, as well as a prison sentence, and open a private mail box, spend $4,000 on mail-order child pornography, and download other child pornography from the Internet.  Other child pornography offenders in this District at least had mental health issues or personal circumstances that could explain (although not justify) their conduct.  No such explanation exists for Lavely.  Lavely also has the social skills and stature in the community (at least until now) that many child pornography offenders lack, making him a more serious risk of offenses against children than most defendants who have received downward departures in this District.

11

If you examine the child pornography cases in which downward departures have been granted, you will almost always find that the offense conduct involved only passive possession, and that there were not other facts that made the conduct more egregious, or added to the risk the defendants presented to children.[4] Here, Lavely admits only to an interest in adolescent girls, but that position is undercut by his attempted purchase of $765 of CD's depicting girls 10-13 years (and perhaps younger) in age. He admits only to photographing adolescent girls, but that position is suspect given his child pornography order.  Here, Lavely denies inappropriate touching of minor females at the community theater where he volunteer much of his free time.  The government remains skeptical.  The offense conduct in this case, demonstrating his long standing interest in young girls, and a current interest in prepubescent girls, should make this court hesitate to ignore the unadjudicated state charges of indecent assault and battery on underage girls. [PSR, ¶44].  Certainly, Lavely's child pornography interests make it more likely that the allegations are not some terrible mistake, or innocent action

---

[4]The <u>Wong</u> case before Judge Lindsay is an exception to this statement.  The search of Wong's residence resulted in the seizure of photographs Wong had taken of a young female child of a friend.  The child was fully clothed but the poses were sexually provocative.  The government strongly opposed any departure in the <u>Wong</u> case.  Judge Lindsay departed, but still imposed a prison sentence of six months.

misinterpreted by the youngsters at the theater.[5]

    Lavely's reliance on what he claims to be extraordinary post-offense rehabilitation should be rejected as a departure basis. First, despite an interest in child pornography that existed at least as early as 1997, Lavely never sought mental health or sex-offender treatment before he was confronted by Postal Inspectors in this case. [PSR, ¶65]. Second, it is neither surprising, nor unusual, that upon the involvement of experienced and highly competent defense counsel, Lavely would obtain the type of treatment he has been receiving since the offense conduct. The undersigned Assistant U.S. Attorney can hardly remember a child pornography defendant that did not, between offense conduct and sentencing, undertake the same types of sex-offender treatment that Lavely has received since this case began. The only difference between Lavely's efforts and the efforts of most other defendants is that most child pornography defendants also subject themselves to a sex-offender evaluation, which Lavely chose not to do. Thus, not only is Lavely's post-offense mental health treatment not unusual, it does not go as far as that of most child pornography defendants.

---

[5]The government is not suggesting that the Stoughton charges should enhance the guideline calculations or effect where within the range a guideline sentence should be imposed. However, those allegations are part of the "something more" that distinguishes Lavely from other child pornography defendants in this District that have in the past received downward departures.

Lavely's reliance on what he claims to be extraordinary family ties and responsibilities should also be rejected as a departure basis.  Lavely has simply not shown such ties and responsibilities to be extraordinary when compared to ordinary cases where the factors are present, particularly in light of First Circuit precedent that requires a showing that the defendant is irreplaceable in order to justify an extraordinary family obligations departure.[6]  United States v. Pereira, 273 F.3d 76, 82 (1st Cir. 2001); United States v. LaCarubba, 184 F. Supp. 2d 89, 91 (D. Mass. 2002) (Gertner, J.).  In Pereira, the First Circuit made it very clear that a loss of some level of care for a relative is not sufficient to establish a defendant as irreplaceable, and that "[a]s long as there are feasible alternatives of care that are relatively comparable to what the defendant provides, the defendant cannot be irreplaceable." Pereira, 272 F.3d at 83.

Lavely's departure argument must be compared not only to other child pornography defendants, but to all defendants.  See United States v. Thompson, 234 F.3d 74 (1st Cir. 2000) (proper

---

[6]Congress's view of the appropriateness of a departure of this sort in a child pornography case was made clear, even if in a non-binding fashion for this case.  One week after the offense conduct in this case, The PROTECT Act, Pub.L. 108-21, directly amended the guidelines to make family ties and responsibilities a prohibited basis for departure in child pornography cases. United States Sentencing Commission, Guidelines Manual, Appendix C, Amendment 649.

approach in departure cases is to compare any given defendant to all defendants regardless of offense). Lavely is not unlike many white collar defendants. He is well-compensated in his employment, [PSR, ¶72], and financially comfortable, as demonstrated by his wife's full ownership, without a mortgage, of a condominium in Hawaii. [PSR, ¶¶74-77]. His children are grown and live outside the parental home. Although incarceration will cost him and his wife three-quarters of their current combined wages for a period of time, his wife is gainfully employed and they jointly have more than sufficient net worth for Lavely's wife to continue to live comfortably. Loss of future earnings by Lavely as a result of his conviction, will flow from that conviction, and not necessarily from any period of incarceration. Lavely's employer is not currently aware of this case [PSR, ¶72], so it cannot be said that his employment will be continued even if he is not incarcerated by this Court. It follows that any financial assistance Lavely currently provides to his son's family is every bit as much in jeopardy whether Lavely is incarcerated or not.

Obviously, the government is sympathetic toward Lavely's autistic grandson. But, as the First Circuit has stated: "[I]t is the unfortunate norm that innocent family members suffer considerable hardship when a relative is incarcerated." Pereira, 272 F.3d at 81. Moreover, Lavely is merely part of the support

for the youngster, and is not the most important part.  He is not the primary care giver.  His grandson lives in an intact supportive family that is highly motivated to deal with their child's autism.  Lavely's absence from his grandson's life will be a temporary loss for the child, but it is not as if the boy's father is unavailable to fill the void.[7]  Lavely himself is employed on a full-time basis, so his time with his grandson must necessarily be outside normal work hours.  As for the financial support provided by Lavely and his wife to their son's family, that support can as easily be continued by selling their vacation condominium in Hawaii as by Lavely's continued employment, which may not continue regardless of the sentence imposed by this Court.  It would be strange indeed if this Court did not impose a period of incarceration because of Lavely's financial obligations to his wife and/or his son, yet the Lavelys continued to own an unencumbered Hawaii condo Lavely estimates to be worth $200,000.[8]

---

[7]In Pereira, the First Circuit cited with approval two cases from other circuits where family circumstances departures were rejected despite the special needs of the defendants' children. Pereira, 272 F.3d at 81 (citing United States v. Rybicki, 96 F.3d 754, 758 (4th Cir. 1996) (defendant had a neurologically impaired nine-year old son who was in need of special supervision and a wife experiencing fragile mental health) and United States v. Sweeting, 213 F.3d 95, 104 (3rd Cir. 2000) (single mother was sole provider for five children, one of whom had a substantial neurological impairment)).

[8]It is also somewhat ironic that Lavely is now trying to use the interests of a child to avoid a prison sentence for crimes that so directly supported the horrific sexual exploitation of children.

Lavely's reliance on what he claims to be "imperfect entrapment" should also be rejected as a departure basis.  The government addressed this issue above, but will repeat the basics.  The government sent a single solicitation to Lavely based on a well-founded belief that he had an existing interest in child pornography.  Although the solicitation was an offer for him to commit a crime, the government provided no more than a single, non-coercive opportunity to commit the crime to an individual who showed by his prior purchases and his response to the solicitation that he was ready and willing to violate the law.  The law permits the government to use a variety of methods to afford an opportunity to a defendant to commit an offense, including the use of a "sting" or undercover operation.  Here, a single undercover solicitation to an individual who had previously ordered child pornography from the same company, which prompted an immediate response and order, cannot constitute imperfect entrapment.  None of the cases cited by Lavely in his memorandum are at all supportive of a finding of imperfect entrapment on the facts before this Court.  One could hardly have less pressure exerted by the government or a more enthused defendant than Lavely, who upon receipt of the solicitation immediately put $765 in an Express Mail envelope and ordered eight CD's containing child pornography.

Lavely's reliance on what he claims to be his unique

17

vulnerability to victimization or abuse in prison should also be rejected as a departure basis.  Lavely has provided this Court with no basis on which to conclude that Lavely is at risk in prison.  It is not as if Lavely is the first, or one of only a few, child pornography offenders in the federal prison system.  Nor is his age or passive, non-threatening manner at all unusual for white collar and/or child pornography offenders.  This will not be the first time BOP will be required to incarcerate a 61 year old grandfather with no prior criminal record.  If this Court departed and refused to impose a prison sentence in this case on the ground of exceptional vulnerability to prison abuse, the same basis would be available to almost all child pornography offenders, as well as many white collar offenders, whose profiles are not markedly different than that of Lavely.  It follows that there are no extraordinary aspects to any vulnerability to prison abuse that Lavely may present.

### §3553(a) Factors

Post-Booker, the applicable guideline sentencing range is one of the §3553(a) factors this Court must consider in arriving at the appropriate sentence to be imposed.   The complete list of factors, which the government will address in turn, are in pertinent part as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-

18

    (A)   to reflect the seriousness of the offense, to
          promote respect for the law, and to provide just
          punishment for the offense;

    (B)   to afford adequate deterrence to criminal
          conduct;

    (C)   to protect the public from further crimes of
          the defendant; and

    (D)   to provide the defendant with needed
          educational or vocational training, medical
          care, or other correctional treatment in the
          most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range
established for –

    (A)   the applicable category of offense committed
          by the applicable category of defendant as
          set forth in the guidelines–

        (i)   issued by the Sentencing Commission pursuant
             to section 994(a)(1) of title 28,
             United States Code, subject to any amendments made
             to such guidelines by act of Congress . . .;
             and

       (ii)  that, except as provided in section
             3742(g), are in effect on the date the
             defendant is sentenced; or

    (B)   in the case of a violation of probation or
          supervised release, . . .

(5) any pertinent policy statement–

    (A)   issued by the Sentencing Commission pursuant
          to section 994(a)(2) of title 28, United
          States Code, subject to . . .; and

    (B)   that, except as provided in section 3742(g),
          is in effect on the date the defendant is
          sentenced.

(6) the need to avoid unwarranted sentence disparities

among defendants with similar records who have been
found guilty of similar conduct; and

(7) the need to provide restitution to any victims of
the offense.

### 1.    The Nature And Circumstances Of The Offense

The nature and circumstances of the offense are discussed
above.  Lavely has a long-standing interest in child pornography
which dates to at least 1997.  He spent more money on child
pornography than any child pornography defendant that the
government can recall.  Moreover, his substantial purchases
directly encouraged and financed an ongoing child pornography
production and distribution business.  The conduct in this case
is far worse than that in the bulk of child pornography cases,
which involve defendants who obtain recycled child pornography
for free from the Internet.

### 2.    The History And Characteristics Of The Defendant

Although Lavely only admits to a sexual interest in
adolescent girls, the record before this Court demonstrates that
his interest extends downward to prepubescent girls in the 10-12
year range, if not younger.  Despite a stable, supportive, and
successful personal and professional life, and the risk that
child pornography posed to that life, Lavely was unable to
withstand the urges that led him continually to seek and obtain
child pornography.  As discussed above, Lavely's life outside his
interest in child pornography only emphasizes the strength of his

sexual interest in children, as does the amount of money he spent and was willing to spend on child pornography.

### 3.    The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

The seriousness of child pornography offenses is demonstrated by Congress's repeated amendments strengthening the child pornography laws, and the Sentencing Commissions's continued amendments to the guidelines, always increasing the punishment for child pornography offenses.  As this Court recognized at the February 8, 2005 hearing in this case: "[I]t seems so abundantly clear that Congress has intended to be –– Congress, the Commission, all particularly harsh with respect to this category of offender." [Hearing transcript, p. 56].

The seriousness of the offense is sometimes lost by merely phrasing the conduct in terms of pictures, and looking at pictures.  It should not be forgotten that the pictures involve real children who were sexually abused at young and vulnerable ages in order to satisfy the sexual interest of persons like Lavely.  Because Lavely sought new child pornography, and not just recycled images from decades ago, he was part of the "market" that prompted C.R.T. to take at least 175 young girls and subject them to life-altering sexual abuse.  C.R.T. was not in the nudist business; it was in the business of hardcore child pornography.  Mariscal admitted that he was in some of the videos

having sex with young girls.  One of the videos ordered by Lavely involved a 12 year old girl having sexual intercourse with an adult male.  Another video was advertised as involving 11-13 year old girls "with a lot older subjects."  The degree of coercion that may have been involved in the production of the videos is not known, but sex with a 12 or 13 year old is statutory rape, at a minimum.

Child pornography offenses have increased dramatically with the growth of the Internet.  In some ways the ready availability of child pornography on the Internet, and the supposed anonymity of the Internet, have depersonalized child pornography crimes. The sentence imposed by this Court on Lavely requires a substantial period of incarceration in order to send a clear and unmistakable message that the possession of child pornography is a serious crime, and that those who encourage the continued sexual exploitation of children, and those who subject children to repeated sexual exploitation by seeking and obtaining sexual gratification from earlier exploitation, will be subject to serious punishment to reflect the seriousness of the offense.

**4.    The Need For The Sentence Imposed To Afford Adequate Deterrence To Criminal Conduct And To Protect The Public From Further Crimes Of The Defendant**

As stated above, there exists in large parts of society a lack of understanding of child pornography crimes.  Too many people think that viewing and collecting child pornography on the

Internet is not a crime, or at least is not a crime for which one will be caught or punished.  People have to understand not only that child pornography is illegal, but that people can be caught with child pornography, prosecuted under criminal laws, and sent to prison.  The more people who understand the consequences of child pornography possession, fewer will be the number of people who take the risks associated with child pornography possession. The public needs to know that downloading child pornography, or responding to mailed solicitations for child pornography, can result in a prison sentence.  A sentence of probation in this case, as requested by Lavely, will send the wrong sort of message to potential offenders.  It will suggest that child pornography is not really that bad, and if you apologize and show remorse, nothing significantly bad will happen.  Deterrence is not advanced by sentences of probation; it is advanced by prison sentences.

   5.   **The Need For The Sentence Imposed To Provide The Defendant With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner**

The government does not suggest that sex-offender treatment is not a necessary part of any sentence imposed by this Court. Lavely's sexual interest in children will not disappear upon sentencing.  In fact, it will never disappear.  The best that can be hoped for is that life-long sex-offender treatment will prevent relapses and permit Lavely to control his sexual

interests.  But, a prison sentence is not inconsistent with a proactive sex-offender treatment program that can be continued at least through the end of the supervised release period by the imposition of special conditions.  FCI--Butner has a sex-offender treatment program that is available to child pornography defendants.  FMC--Devens has a sex offender management program that is also available to child pornography defendants.  Either or both programs could be recommended by the Court.

**6.    The Kinds Of Sentences Available**

Without a departure, the guidelines provide only one kind of sentence for Lavely's crime: imprisonment.  His GSR is solidly within Zone D of the Sentencing Table, and alternative sentences to incarceration are not available absent a departure.

**7.    The Kinds Of Sentence And The Sentencing Range Established By The United States Sentencing Guidelines And Any Applicable Policy Statements**

There is no dispute in this case that the applicable GSR is 21-27 months.[9]  This Court, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  United States v. Booker, 125 S.Ct.

---

[9]The GSR could have been higher.  The government could have charged Lavely with possession of child pornography based on the more than 600 images on his computer.  If it had done so, the resulting GSR would have been 27-33 months.  Additionally, if the controlled delivery of child pornography to Lavely had occurred one week later, he would have been subject to the five-year mandatory minimum that became effective on April 30, 2003 as part of the PROTECT Act.

738, 767 (2005).  The features of the guideline system after

Booker, "while not the system Congress enacted, nonetheless

continue to move sentencing in Congress' preferred direction,

helping to avoid excessive sentencing disparities while

maintaining flexibility sufficient to individualize sentences

where necessary."  Id.  In this particular case, we know that

even after the offense conduct, in fact, only one week after the

offense conduct, Congress again sent a clear and unmistakable

message that lengthy prison sentences should be imposed in child

pornography cases, enacting the PROTECT Act with its mandatory

child pornography sentences.

    **8.    The Need To Avoid Unwarranted Sentence Disparities
            Among Defendants With Similar Records Who Have Been
            Found Guilty Of Similar Conduct**

    This Court needs to exercise caution that it does not

unintentionally create an unwarranted sentence disparity among

child pornography defendants because of the way Lavely presents

in court.  Lavely is the classic white collar defendant, who

except for the offense conduct in this case, would not be

expected to be a criminal defendant.  The Court must guard

against leniency based on Lavely's otherwise upstanding personal

and professional stature.  The Court should ask itself how it

would sentence a defendant who committed the exact same offense

conduct as Lavely, but looked like a bum, photographed adolescent

girls, volunteered as the janitor at a community theater, was

otherwise unemployed, was divorced or unmarried, collected disability from the government, and lived in a rooming house for transients.  The sentences in the two cases should be the same.

**9.    The Need To Provide Restitution To Any Victims Of The Offense**

Restitution is not applicable to this case.

**<u>Recommendation</u>**

For the many reasons stated above, this Court should reject Lavely's departure arguments, and find that the undisputed GSR in this case properly reflects the §3553(a) factors that govern the imposition of a sentence in this case.  Accordingly, the government recommends that this Court sentence Anthony Lavely to 21 months in prison, with a recommendation that he be placed in either the Butner sex-offender treatment program or the Devens sex-offender management program, to be followed by three years of supervised release with special conditions that require mental health and sex-offender specific treatment, including the use of polygraph testing as an adjunct to his therapeutic treatment, a fine of $5,000, and a special assessment of $100.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  <u>/s/ Timothy Q. Feeley</u>
TIMOTHY Q. FEELEY
Assistant U.S. Attorney
(627) 748-3172

July 19, 2005

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

Stephen R. Delinsky, Esq.
Eckert Seamans Cherin & Mellott, LLC
One International Place
18th Floor
Boston, MA 02110

This 19th day of July 2005.

<u>/s/ Timothy Q. Feeley</u>
TIMOTHY Q. FEELEY
ASSISTANT UNITED STATES ATTORNEY