UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                    )      CRIMINAL NO. 04 CR 10025-NG<br>)<br>ANTHONY LAVELY                       )<br>_____) | |

**SUPPLEMENTAL SENTENCING MEMORANDUM OF
THE DEFENDANT, ANTHONY LAVELY**

This Supplemental Sentencing Memorandum addresses sentencing issues identified by the Court and raised by the government during the previous sentencing hearing held on July 27, 2005. Defendant Anthony Lavely ("Mr. Lavely") also presents additional post-<u>Booker</u> factors pursuant to 18 U.S.C. §3553(a) in support of a sentence of probation that could also be met by a period of home detention with the condition that Mr. Lavely would be free to continue to work, as well as continued psychological treatment. As a further condition of probation, there should be a requirement of community service such as helping the elderly in a nursing home setting. Mr. Lavely incorporates by reference herein the arguments set forth in *Sentencing Memorandum of the Defendant, Anthony Lavely*, previously filed with the Court on July 12, 2005.

I.    **Analysis of C.R.T. Videotapes Seized from Mr. Lavely's Residence on April 23, 2003**

During the previous sentencing hearing held on July 27, 2005, the Court focused on Mr. Lavely's prior purchases from C.R.T. from 1997 to 1999. The Court was particularly interested in the content of the videos that Mr. Lavely previously ordered from C.R.T. and whether the images depicted on those tapes were similar to the type of "hardcore" child pornography which the government offered to Mr. Lavely as part of its undercover sting operation which would

support the government's assertion that Mr. Lavely was a direct contributor to the exploitation and abuse of children, and, therefore, within the heartland of offenders.

Consequently, the government and Mr. Lavely's attorneys conducted independent reviews of the thirty videotapes seized from Mr. Lavely's residence that he previously ordered from C.R.T. to determine their content. Mr. Lavely's attorneys concluded that none of the tapes seized from Mr. Lavely that originated from C.R.T. are similar in content to the explicit child pornography that was offered by the government to Mr. Lavely as part of the undercover sting operation, and that twenty out of the thirty tapes do not contain chargeable child pornography. Ten out of the thirty videotapes that originated from C.R.T. depict images of chargeable child pornography and involve only the lascivious exhibition of genitals or pubic area of minors, thereby meeting the technical definition of sexually explicit conduct pursuant to 18 U.S.C. §2256(2)(A). These ten tapes have a combined total of approximately twenty hours of video footage. The defense understands that the government agrees with this analysis of the tapes.

The images that meet the technical definition of child pornography represent less than 10% of the total video footage contained on the ten tapes. The videos involve a great deal of conduct that would not be deemed sexually explicit and include images of girls dancing, exercising, and modeling in either a clothed, semi-clothed or nude state. In the tapes that contain chargeable child pornography, the camera briefly focuses on the genital areas of the girls while they are exercising or posing. There is no conduct depicted on the tapes that involves sexual intercourse of any kind, oral sex, masturbation, sexual interaction with adults, use of sex toys or other foreign objects or any sadistic or masochistic abuse.

## II. The Contrast Between Mr. Lavely's C.R.T. Ordering from 1997 to 1999 and the Sting Ordering

The contrast in content between the tapes Mr. Lavely ordered from C.R.T. from 1997 to 1999 and those that were offered to him as part of the undercover C.R.T. sting operation is extremely significant for several reasons. First, it directly refutes the government's claim that Mr. Lavely was a long-standing and important consumer of child pornography from C.R.T. Second, it puts into proper context the amount of money that Mr. Lavely spent on tapes ordered from C.R.T. Third, the government has not produced any evidence to demonstrate that Mr. Lavely received advertisements from C.R.T. that described the same type of sexually explicit material that the government offered to Mr. Lavely as part of its undercover sting operation.

First, this contrast in content between the tapes Mr. Lavely previously ordered from C.R.T. and those that were offered as part of the government's undercover sting operation directly refutes the government's claim that Mr. Lavely was a long-standing and important consumer of child pornography from C.R.T. The vast majority of the videos that Mr. Lavely ordered from C.R.T. from 1997 to 1999 did not contain images of child pornography and the small percentage of footage that met the technical definition of sexually explicit conduct pursuant to 18 U.S.C. 2256(2)(A) involved only the brief lascivious exhibition of genitals. These images were not remotely similar to those that the government offered to Mr. Lavely as part of its undercover C.R.T. sting operation.

Second, the amount of money that Mr. Lavely spent on tapes ordered from C.R.T. from 1997 to 1999 must be placed in proper context. In *Government's Sentencing Memorandum and Opposition to Defendant's Downward Departure Motions*, and during the sentencing hearing, counsel for the government placed great emphasis on the total amount of money Mr. Lavely paid

for videos that he purchased from C.R.T. as a factor that removed this case from the norm. Specifically, the government claimed that Mr. Lavely paid over $3,375 to C.R.T. for child pornography.  See Government's Sentencing Memorandum at 4, 5. After reviewing the tapes, this accusation has obviously been proven false. The vast majority of the tapes that Mr. Lavely purchased from C.R.T. did not contain child pornography. Consequently, the government's assertion that this case is exceptional because "it knows of no case in this District where a child pornography defendant spent, or was willing to spend, anything close to $4,000 on child pornography" is a complete mischaracterization of Mr. Lavely's conduct and should be disregarded by this Court. Id. at 5.

Third, the government has not produced any evidence to demonstrate that Mr. Lavely received advertisements from C.R.T. that described the same type of sexually explicit material that the government offered to Mr. Lavely as part of its undercover sting operation. Following the sentencing hearing on July 27, 2005, Mr. Lavely's attorneys requested the government to produce the advertisements and product descriptions for the tapes that Mr. Lavely previously ordered from C.R.T. This was requested to determine the types of videos that Mr. Lavely was offered in the past in order to establish Mr. Lavely's knowledge and awareness of the content of the material that C.R.T. produced, and to understand his state of mind at the time he responded to the government's undercover solicitation. In response, the government could only produce one product advertisement that originated from C.R.T. See C.R.T. Product Advertisement, attached hereto as Exhibit 1. The government also produced general product descriptions that were seized from C.R.T. See Product Descriptions, attached hereto as Exhibit 2. This material further contradicts the claim that Mr. Lavely was a long-standing consumer of child pornography from C.R.T. and that he was on notice of the hardcore, sexually exploitative images that Angel

{K0312914.1}                                      4

Mariscal and C.R.T. were found to have produced. Specifically, the advertisement and product descriptions that were produced by C.R.T. describe videos that are in no way comparable in content to the tapes offered by the government to Mr. Lavely as part of its undercover sting operation.

The C.R.T. advertisement attached as Exhibit 1 does not offer the customer the option of creating a fantasy script, a factor in which the Court placed great emphasis during the previous sentencing hearing. In addition, one of the videos listed on the advertisement, titled "Portraits 5 & 6", was previously ordered by Mr. Lavely and seized from his residence by the government. This is one of the twenty videos that did not contain images of child pornography. Similar to most of the C.R.T. videos that were previously ordered by Mr. Lavely from 1997 to 1999, the video depicted female models who were in their late teens, posing in a clothed, semi-clothed and nude state. Once again, there was no footage of acts involving sexual intercourse, oral sex, masturbation or any type of behavior remotely similar to that which was offered by the government to Mr. Lavely as part of the C.R.T. sting operation. In addition, the order form that Mr. Lavely used to request Portraits 5 & 6, as well as all but one of the order forms that he used to order videos from C.R.T. from 1997 to 1999, contained a notice stating that "all material adheres to Federal Law." See Order Form, attached as Exhibit 3. In addition, the C.R.T. product descriptions attached as Exhibit 2, also assure customers that "we do not have any pornography or sexual situations" and that "all volumes have been reviewed by legal attorneys and they fall within federal guidelines." Although he acknowledges that ignorance of the law is not a valid defense, Mr. Lavely submits that these legal notices are significant in evaluating his understanding of the type of products that C.R.T. produced and his state of mind at the time he responded to the government's undercover advertisement.

### III. The Sting Mischaracterized Mr. Lavely's Prior Ordering Pattern from C.R.T.

In contrast to the original C.R.T. product description and order forms, the advertisement used by the government as part of its undercover operation left out the prior declarations of legality. The sting advertisement also offered the option of creating a fantasy script and described videos that were clearly in a much more sexually explicit category than those videos that Mr. Lavely previously ordered from C.R.T. Through his previous orders to C.R.T., Mr. Lavely gave no indication that he was interested in the type of sexually explicit material offered by the government's undercover sting operation. Instead of sending Mr. Lavely an advertisement offering videos that were consistent in content with those that he previously ordered from C.R.T., the government crafted an advertisement using incendiary sexually explicit descriptions with the intent to demonstrate that Mr. Lavely was a knowing contributor of the sexual exploitation and abuse of children. The government clearly manipulated the aggravating factors in this case by offering hardcore child pornography even though Mr. Lavely had shown no interest for such C.R.T. material in the past. These factors reinforce Mr. Lavely's argument of imperfect entrapment set forth in his *Sentencing Memorandum* and demonstrate that the government encouraged Mr. Lavely to commit this offense in a manner with the greatest possible impact on sentencing. Mr. Lavely submits that the advertisements, order forms, and tapes that he ordered from C.R.T. from 1997 to 1999, reflect his state of mind and awareness of the content of typical videos produced by C.R.T. from the time that he purchased material from C.R.T. from 1997 to 1999 to the moment he responded to the government's undercover solicitation.

Dr. Schwartz's letter to the Court, attached hereto as Exhibit 4, provides important additional insight into Mr. Lavely's thought process. Mr. Lavely told Dr. Schwartz that he did

{K0312914.1}                                6

not consider the tapes that he previously ordered from C.R.T. to constitute child pornography because they did not contain depictions of sexual acts. Obviously, ignorance of the law is not an excuse and Mr. Lavely now realizes that the lascivious exhibition of genitals constitutes child pornography. Mr. Lavely also told Dr. Schwartz that he ordered the tapes offered to him by the government's undercover operation because he had enjoyed looking at the models in the previous tapes produced by C.R.T. According to Dr. Schwartz, Mr. Lavely's interest in looking at attractive adolescent models is not to be considered sexually deviant but rather part of a normal adult sexual arousal pattern. During therapy, Mr. Lavely further related that he did not believe that the explicit sexual scenes described in the government's undercover advertisement were "real", if they existed at all. If the scenes described in the government's advertisement actually existed on the tapes, Mr. Lavely told Dr. Schwartz that he assumed that there would be a disclaimer on the tapes, consistent with the other legal notices contained on the previous order forms and product descriptions, stating that the individuals depicted in the videos were over 18 years of age. In her report, Dr. Schwartz stated that it never occurred to Mr. Lavely that he would be viewing actual depictions of the sexual abuse of children.

Mr. Lavely's state of mind at the time he ordered the tapes from the government is also reflected in the statement he provided to Postal Inspector Richard Irvine on April 23, 2003, immediately after he was confronted by law enforcement officers after receiving the controlled delivery. See Mr. Lavely's statement dated April 23, 2003, attached hereto as Exhibit 5. In his statement, Mr. Lavely said, "I have agreed to provide [Postal Inspector Irvine] all [material previously ordered from C.R.T.] in my possession, though I hope that investigations will show that such or all of that material will meet the best of legitimacy. It was not my interest to support any activity which would cause harm to anyone, especially a child." Id.

Based upon the above factors that have been uncovered since the last sentencing hearing, it is clear that the government has grossly exaggerated and mischaracterized Mr. Lavely's contribution to the C.R.T. child pornography enterprise and his awareness of the exploitation and sexual abuse of children that took place.

IV.  **Inadequacy of the Advisory Guideline Sentencing Range in Relation to Mr. Lavely's Conduct**

In consideration of the content of the tapes that Mr. Lavely ordered from C.R.T. from 1997 to 1999, his state of mind at the time that he responded to the government's undercover solicitation, and Dr. Schwartz's evaluations and assessment of Mr. Lavely's behavior, the defense submits that the advisory Guidelines are entirely inadequate in reflecting an appropriate sentence in this case. The Sentencing Commission addressed distinctions between producers, transmitters, receivers and possessors of child pornography but it did not adequately address distinctions within the class of receivers or possessors of child pornography. See United States v. Stevens, 29 F. Supp. 2d 592, 607 (D. Alaska 1998) (reversed under a pre-Booker Guideline analysis). There are obvious differences in the range of conduct of individuals who are guilty of receipt or possession of child pornography, as well as the range in content of images that a defendant received or possessed, and the Guidelines do not adequately address those differences. See Stevens, 29 F. Supp. 2d at 607 (finding that "an examination of the reported cases, considered against the background of the testimony in this case and the various commission reports dealing with pornography and the legislative history of the statutes, leads this Court to conclude that there are significant differences between the conduct of the various individuals who are guilty of mere possession and that the Sentencing Guidelines do not adequately address those differences.").

Pursuant to 18 U.S.C. §2256(2)(A), the term "sexually explicit conduct" is defined as actual or simulated:

> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
> (ii) bestiality;
> (iii) masturbation;
> (iv) sadistic or masochistic abuse; or
> (v) *lascivious exhibition of the genitals or pubic area of any person...*

18 U.S.C. §2256(2)(A) (emphasis added). It is this last category which a small percentage of the C.R.T. tapes seized form Mr. Lavely's residence fall under. The ten tapes that Mr. Lavely previously ordered from C.R.T. from 1997 to 1999 that meet the technical definition of child pornography because they contain the lascivious exhibition of genitals or pubic area of minors constitute a completely different level or category of "sexually explicit conduct" than material depicting explicit sexual acts involving minors. The guidelines, however, do not adequately account for this qualitative disparity.

Based on the content of the tapes that Mr. Lavely ordered from C.R.T. from 1997 to 1999 and the fact that he was a mere recipient of pornographic materials resulting solely from the government's unsolicited advertisement, Mr. Lavely submits that his conduct was at the minimal end of the spectrum of offenses contemplated by the Guidelines and which Congress sought to prevent. Id. at 603, 607. Mr. Lavely is not one of the offenders for whom collection of child pornography is a supplement to the molestation of children. Id. at 604. He is also not involved in one of the fundamental harms identified by Congress, specifically, the use of pornography to seduce child victims. Id. at 603; see also Child Pornography Protection Act of 1997, Pub. L. No. 104-208 ("child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children"). In

addition, Dr. Schwartz, a forensic psychologist who has evaluated over a thousand sexual offenders or individuals diagnosed as sexually compulsive, and who treated Mr. Lavely in weekly individual therapy sessions for over two years at New England Forensic Associates, has concluded that based on both her research and her own clinical experience with individuals who acquire child pornography, Mr. Lavely's conduct falls outside of the "heartland" of the offense for which he was charged. See Dr. Schwartz's letter dated June 30, 2005 attached as Exhibit 1 to *Defendant's Sentencing Memorandum*. According to Dr. Schwartz, Mr. Lavely's conduct is radically different from an offender who uses child pornography to feed his sexual arousal and molest children. Most importantly, in her expert opinion, Mr. Lavely is not a pedophile. See Transcript of Dr. Schwartz's testimony at Mr. Lavely's sentencing hearing on February 8, 2005 at 39.

Unlike offenders who access or purchase child pornography to satisfy their pedophilia, Dr. Schwartz believes that Mr. Lavely displayed aspects of a "curiosity seeker" in his purchase of the material from the government's sting operation. Dr. Schwartz's findings that Mr. Lavely demonstrated traits of the curious and disorganized type behavior was reinforced by the fact that only a small fraction of the videos he previously ordered from C.R.T. contained images of child pornography. As Dr. Schwartz reasoned, someone who is primarily interested in child pornography could more readily obtain such materials as opposed to purchasing thirty expensive tapes of which only a very percentage contained images of female genitalia. See Exhibit 4.

## V.     Mr. Lavely's Evaluation and Treatment

In the *Government's Sentencing Memorandum and Opposition to Defendant's Downward Departure Motions* and during the previous sentencing hearings, the government asserted that Mr. Lavely did not undergo a complete sex-offender evaluation. Specifically, the government has argued that there was no analysis conducted of Mr. Lavely's history of sexual interests to include child pornography. In response, Mr. Lavely offers a letter from Dr. Schwartz, attached hereto as Exhibit 4, which directly addresses the government's misguided argument and provides an update on Mr. Lavely's progress. Dr. Schwartz explains that in addition to having access to the results of the Abel Assessment of Sexual Interest and the Penile Plethysmography Laboratory Study, which indicated that Mr. Lavely did not demonstrate deviant arousal or deviant sexual interest in children under the age of 13, she has been able to discuss all of the relevant issues in this case in weekly therapy sessions that began over two years ago. Despite the government's attempt to imply that Mr. Lavely is hiding something from his background or that his evaluation was somehow deficient, Dr. Schwartz assures the Court that there is <u>no</u> information relevant to Mr. Lavely's treatment or to her assessment of his risk to re-offend that she is lacking.

Dr. Schwartz also reports that Mr. Lavely has been doing very well in his treatment. Notably, he has developed a Relapse Prevention Plan and he has completed all of the major components of a sex offenders treatment program. Dr. Schwartz also notes that Mr. Lavely has developed other interests and, most importantly, he does not present a risk to the public.

Mr. Lavely submits that Dr. Schwartz's findings should not only be considered to rebut the government's assertions that the sex-offender evaluation that was completed in this case was

{K0312914.1}                                     11

somehow deficient, but as additional grounds for an appropriate sentence that will take into account his history and characteristics, protect the public from further crimes of the defendant, and provide Mr. Lavely with additional treatment in the most effective manner. 18 U.S.C. §3553(a).

VI.     **Mr. Lavely's Low Likelihood of Recidivism Based on Personal Background**

Mr. Lavely is 62 years old. He received undergraduate and graduate degrees in electrical engineering from Drexel University in 1972 and 1978, respectively. He also earned an MBA from Babson College in May 1993. Mr. Lavely and his wife have been married for over thirty-eight years. Mr. Lavely presently works as a senior manager for Mercury Computer Systems in Chelmsford, Massachusetts and he has been employed by Mercury since 1990. Mr. Lavely rarely drinks alcohol and he has never experimented with illegal substances. He also has no record of prior convictions.

Studies show that the likelihood of recidivism by an individual with Mr. Lavely's personal background is very low. First, according to a United States Sentencing Commission Report released in May 2004, "[r]ecidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." See U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://www.ussc.gov/publicat/Recidivism-General.pdf. The report also states, "[a]mong all offenders under age 21, the recidivism rate is 35.5%, while offenders over age 50 have a recidivism rate of 9.5%." Id. Second, the recidivism rate for offenders with college degrees is only 8.8%. Id. Third, offenders with stable employment in the year prior to their

instant offense are less likely to recidivate (19.6%) than those who are unemployed. <u>Id</u>. Fourth, the recidivism rate for offenders who are married is only 13.8%, compared to those who are divorced (19.5%) or who have never married (32.3%). <u>Id</u>. Finally, offenders such as Mr. Lavely who do not use illicit drugs have a much lower recidivism rate (17.4%) than those who used illegal substances within one year prior to their instant offense (31.0%). <u>Id</u>. At 13.

The relevance of the Sentencing Commission's study to Mr. Lavely's case is even more compelling when viewed in light of Dr. Schwartz's findings. <u>See</u> Exhibit 4. Dr. Schwartz believes that Mr. Lavely has a very low recidivism base rate. She bases her opinion on the lack of a clearly defined victim, Mr. Lavely's history of law abiding behavior, his age, and other static factors. This low recidivism rate is further mitigated by his supportive family, his job position, his lack of substance history, as well as his development of a Relapse Prevention Plan. In her expert opinion, Mr. Lavely poses a very low risk to re-offend.

Mr. Lavely submits that the Court should favorably consider his low likelihood of recidivism based on a combination of the Sentencing Commission's study, as well as Dr. Schwartz's findings that were derived from two years of weekly therapy sessions, in crafting a sentence designed to "protect the public from further crimes of the defendant." 18 U.S.S.C. §3553 (a)(2); <u>see also</u> <u>United States v. Nellum</u>, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (finding that a sentence below the advisory guidelines was warranted after considering the defendant's age and reduced likelihood of recidivism as indicated by the study conducted by the United States Sentencing Commission).

## VII. Mr. Lavely's Record of Employment and Prospects for Future Employment

Attached as Exhibit 6, is a letter from Dean Holman, one of Mr. Lavely's colleagues at Mercury Computer Systems, which provides additional insight into the importance of Mr. Lavely's contributions to his employer and its customers, as well as Mr. Lavely's prospects for continued employment at the company.

In his letter, Mr. Holman not only conveys the decency, compassion, and leadership that Mr. Lavely displays at work, but also Mr. Lavely's pivotal role in the Mercury's operations all over the world. It is clear that Mr. Lavely has not only had an enormous positive impact on those with whom he works, but he has also made substantial contributions to his employer's success. Mr. Holman explains that Mercury's senior management firmly supports Mr. Lavely, that his unique position is greatly valued and appreciated by the company, and, most importantly, that Mr. Lavely is welcome at Mercury as long as he is free to work. These sentiments were echoed by Mercury's outside legal counsel who informed Mr. Lavely's attorney that the company would want to continue to employ Mr. Lavely so long as he is not incarcerated.

Accordingly, Mr. Lavely submits that his record of achievement at Mercury and his prospects for continued employment with the company should be favorably considered by this Court in evaluating Mr. Lavely's personal history and characteristics and imposing a sentence that is sufficient, but not greater than necessary pursuant to §3553(a).

## VIII. Mr. Lavely's Family Ties and Responsibilities

Mr. Lavely's wife of thirty-eight years, Martha Lavely, has provided the Court with additional information regarding her husband and his special relationship with his family. See

{K0312914.1}                                14

Martha Lavely's letter, attached hereto as Exhibit 7. It is clear after reading Mrs. Lavely's letter that she and her husband share a special relationship and that he is devoted to his family. He is a source of great strength and compassion to his family and friends and his absence would have a profound negative impact on those who look to him for support and guidance. It is also evident that Mr. Lavely deeply regrets the poor decisions he made that resulted in this offense and that he would not put his family or himself in this position again.

Mr. Lavely submits that his ties and responsibilities to his family, as demonstrated by Mrs. Lavely's letter and in the letters previously submitted to the Court, should be favorably considered in evaluating his history and characteristics and imposing a sentence that is sufficient, but not greater than necessary pursuant to §3553(a).

## IX. Conclusion

For the foregoing reasons, Mr. Lavely requests that the Court impose a sentence of probation that could also be met by a period of home detention with the condition that Mr. Lavely would be free to continue to work, and continued psychological treatment. As a further condition of probation, there should be a requirement of community service such as helping the elderly in a nursing home setting.

                                        Respectfully Submitted,
                                        ANTHONY LAVELY

                                        By his attorneys,

                                        _____
                                        Stephen R. Delinsky  (BBO #119120)
                                        Andrew R. McConville (BBO #632804)
                                        **ECKERT, SEAMANS, CHERIN & MELLOTT, LLC**
                                        One International Place, 18th Floor
                                        Boston, Massachusetts 02110
DATED: November 1, 2005          Telephone No.:  (617) 342-6800